**Jose MARTINEZ HIGH, Petitioner,**

v.

**Tony TURPIN, Warden, Georgia Diagnostic and Classification Center, Respondent.**

**No. CV 196–067.**

United States District Court, S.D. Georgia, Augusta Division.

July 24, 1998.

Jose Martinez High, Georgia Diagnostic & Classification Center, Jackson, GA, Michael C. Garrett, Garrett & Gilliard, Augusta, GA, Mark Evan Olive, Tallahassee, FL, for petitioner.

Mary Beth Westmoreland, Atlanta, GA, for respondent.

## ORDER

BOWEN, District Judge.

Jose Martinez High petitions this Court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his conviction and death sentence on numerous grounds. After careful consideration of the Petition and the other materials submitted by the parties, High's Petition is **DENIED** for the reasons set forth below.

## I. BACKGROUND

Jose High was convicted and sentenced to death in 1978 in the Superior Court of Taliaferro County, Georgia, for the crimes of murder, armed robbery, and kidnapping with bodily injury.[1] The facts of the case have been summarized as follows:

> Jose High and his accomplices, Nathan Brown and Judson Ruffin, robbed a service station in [Crawfordville, Georgia] on July 26, 1976. The station operator (Henry Lee Phillips) and his eleven-year-old stepson (Bonnie Bullock)[2] were abducted during the course of the robbery. Phillips was placed in the trunk of Ruffin's car; Bonnie Bullock was placed in the back seat. High and his accomplices drove the two to a remote site where they were to be eliminated. The eleven-year old was taunted by High as they rode in the back seat of the car: "Are you ready to die? Do you want to die? Well, you're going to die." The child begged for his life. Upon reaching a deserted wooded area, the victims were forced to lie face down in front of the car. The victims were then shot by the three defendants. Bonnie Bullock died of a bullet wound to the head. Phillips suffered a gun shot wound to the head and wrist. Having been left for dead, Phillips miraculously survived and later identified High, Ruffin, and Brown. High later confessed to the murder.

*High v. Kemp,* 819 F.2d 988, 990 (11th Cir. 1987) (footnote added). The Supreme Court of Georgia affirmed High's convictions on

---

1. High also was convicted at aggravated assault and unlawful possession of a firearm during the commission of a crime, but these convictions were reversed because the crimes were held to have merged into the crimes of kidnapping with bodily injury and armed robbery. *High v. State,* 247 Ga. 289, 294–95, 276 S.E.2d 5 (1981).

2. The Eleventh Circuit in its opinion refers to the deceased victim as Bonnie *Bullock* rather than as Bonnie *Bulloch.* Petitioner has employed both spellings in the instant Petition. This Court will adhere to the latter spelling, as it is consistent with the spelling used by this Court in related proceedings as well as the spelling used in the transcript of the trial itself.

direct appeal, but vacated his death sentences for armed robbery and for the one count of kidnapping in which the victim did not die. *High v. State,* 247 Ga. 289, 297, 276 S.E.2d 5 (1981). High's request for rehearing was denied, and the United States Supreme Court denied his petition for a writ of certiorari as well as his subsequent petition for rehearing. *High v. Georgia,* 455 U.S. 927, 102 S.Ct. 1290, 71 L.Ed.2d 470, *reh'g denied,* 455 U.S. 1038, 102 S.Ct. 1742, 72 L.Ed.2d 156 (1982).

High next filed a state habeas corpus petition in the Superior Court of Butts County, Georgia, which was denied on September 10, 1982. The Supreme Court of Georgia affirmed, *High v. Zant,* 250 Ga. 693, 300 S.E.2d 654 (1983), and denied High's request for rehearing. The United States Supreme Court again denied his petition for a writ of certiorari and his petition for rehearing. *High v. Kemp,* 467 U.S. 1220, 104 S.Ct. 2669, 81 L.Ed.2d 374, *reh'g denied,* 468 U.S. 1224, 105 S.Ct. 22, 82 L.Ed.2d 917 (1984). High

then filed a habeas corpus petition in this Court, alleging twenty-five errors of constitutional dimension in his trial and sentencing. *High v. Kemp,* 623 F.Supp. 316, 318–19 (S.D.Ga.1985).[3] I carefully considered each of these claims and concluded that all but one were without merit: I reluctantly decided that High's death sentence had to be set aside because of inadequate jury instructions on the nature and function of mitigating circumstances. *Id.* at 327–28. On appeal, however, the Eleventh Circuit reversed the grant of the writ on these grounds and affirmed the denial of High's other claims for relief. *High v. Kemp,* 819 F.2d at 991. The Court of Appeals later denied High's request for rehearing *en banc. High v. Kemp,* 828 F.2d 775 (1987). The United States Supreme Court initially granted High's petition for a writ of certiorari, *High v. Zant,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988), but later vacated that decision and denied certiorari. *High v. Zant,* 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

3. Specifically, High alleged the following in support of his first federal petition:

A. His counsel provided ineffective assistance during the sentencing phase of petitioner's trial. Paragraphs 13–15.

B. The death penalty oriented qualification of his jury. Paragraphs 16–20.

C. Certain jurors were prematurely excluded in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Paragraphs 21–23.

D. The *voir dire* procedures denied petitioner his right to a fair trial. Paragraphs 24–27.

E. The Georgia statute which gives the state peremptory strikes is unconstitutional. Paragraphs 28–29.

F. Petitioner was denied state paid assistance of experts in the preparation of his case. Paragraphs 30–32.

G. The venue of petitioner's trial should have been changed due to pre-trial publicity. Paragraphs 33–36.

H. Petitioner was denied his right to a speedy trial. Paragraphs 37–40.

I. Petitioner's statements and certain physical evidence were obtained as the result of an arrest that violated the Fourth and Fourteenth Amendments. Paragraphs 41–45.

J. Petitioner was denied a fair trial. Paragraphs 46–47.

K. The failure to record bench conferences violated petitioner's constitutional rights. Paragraphs 48–49.

L. Petitioner was denied state paid assistance in pursuing habeas corpus relief. Paragraph 50.

M. The jury instructions on intent unconstitutionally shifted the burden of proof to the petitioner. Paragraphs 51–54.

N. The trial court gave other improper instructions during the guilt-innocence phase of the trial. Paragraph 55.

O. Improper prosecutorial argument during the guilt-innocence phase of the trial. Paragraphs 56–59.

P. Improper prosecutorial argument during the sentencing phase of the trial. Paragraphs 60–64.

Q. Sentence of death for this petitioner is cruel and unusual punishment. Paragraphs 65–67.

R. Georgia's "aggravating circumstances" statute was applied in an overly broad manner. Paragraphs 68–70.

S. The jury instructions on mitigating and aggravating circumstances were improper and inadequate. Paragraphs 71–73.

T. Multiple death counts were improperly submitted to the jury. Paragraphs 74–75.

U. Petitioner was improperly sentenced for crimes that merged. Paragraph 76.

V; W. Petitioner's sentence is arbitrary and discriminatory. Paragraphs 77–83.

X. The appellate review process violates petitioner's constitutional rights. Paragraphs 84–86.

Y. Petitioner improperly received the death sentence. Paragraph 87.

Z. The means of execution in Georgia is unconstitutional. Paragraphs 88–89.

623 F.Supp. at 318–19.

High next filed in this Court a motion for relief from judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure, which I denied. The Eleventh Circuit affirmed this decision, *High v. Zant,* 916 F.2d 1507, 1510 (11th Cir.1990), and denied High's request for rehearing. The United States Supreme Court again denied High's petition for a writ of certiorari and his subsequent petition for rehearing. *High v. Zant,* 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483, *reh'g denied,* 500 U.S. 938, 111 S.Ct. 2069, 114 L.Ed.2d 473 (1991).

On May 21, 1991—the day after his petition for rehearing was denied by the Supreme Court—High filed his second state habeas petition in the Superior Court of Butts County. That court held an evidentiary hearing in September 1991 limited to the issues surrounding a filmed interview of High which had recently surfaced.[4] However, the court dismissed High's entire petition on March 8, 1994, concluding in a three-page opinion that, to the extent High's claims were not already barred by *res judicata* principles, he reasonably could have raised them in his first habeas petition and therefore they were procedurally defaulted under O.C.G.A. § 9–14–51.[5] The Supreme Court of Georgia denied High's application for a certificate of probable cause to appeal, and the United States Supreme Court once again denied High's petition for a writ of certiorari and his petition for rehearing. *High v. Thomas,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671, *reh'g denied,* 516 U.S. 1154, 116 S.Ct. 1036, 134 L.Ed.2d 113 (1996).

On April 23, 1996, High filed the instant Petition in this Court, setting forth twelve enumerated claims in support of his request for habeas relief:

1. The state failed to disclose exculpatory information requested by High.

2. High was convicted and sentenced to death on the basis of false and inaccurate information knowingly presented to the jury.

3. High cannot be executed because he is actually innocent and because he had no intent to kill.

4. The state's chief witness against High lied with respect to certain critical issues at trial.

5. High's pretrial counsel had a conflict of interest.

6. The emotionally and racially charged atmosphere surrounding High's trial denied him a fair trial.

7. High was denied his right to the independent and competent assistance of mental health experts.

8. The prosecutor impermissibly invoked God, religion, and the Bible as a justification for convicting High and for sentencing him to death.

9. The jurors improperly participated in a prayer session with a bailiff.

10. The trial court gave inadequate jury instructions regarding the meaning and function of mitigating circumstances.

11. Georgia's aggravating circumstances statute has been applied unconstitutionally in High's case.

12. The trial court failed to instruct the jury on an essential element of conspiracy.

## II. STANDARD OF REVIEW

High filed this Petition one day prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and therefore this case is governed by pre–AEDPA law.[6] *See Lindh v. Murphy,*

---

4. This film is the primary basis for claims 1–4 of the instant Petition, and the circumstances surrounding it are discussed in detail herein.

5. O.C.G.A. § 9–14–51 provides as follows:

 All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition. Any grounds not so raised are waived unless the Constitution of the United States or of this state otherwise requires or unless any judge to

whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.

6. Although the AEDPA provides for retroactive application of certain new provisions in capital cases, *see* 28 U.S.C.A. §§ 2261–66 (West Supp. 1997), these provisions apply only if the state which has custody of the petitioner has a satisfactory mechanism for the appointment of coun-

521 U.S. 320, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997). Before addressing the merits of High's claims, however, the Court first must determine whether he is barred from raising them in this second[7] federal Petition. *See Sawyer v. Whitley,* 505 U.S. 333, 338–39, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *Macklin v. Singletary,* 24 F.3d 1307, 1310 (11th Cir.1994).

■■■ Under Rule 9(b) of the Rules Governing Section 2254 Cases,

> [a] second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

When the government pleads abuse of the writ in response to a petitioner's second or successive habeas petition, the petitioner bears the burden of showing that his previously unasserted claims are not an abuse of the writ. *McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).[8] The petitioner's failure to raise the claim in an earlier petition will be excused if he can "show cause for failing to raise it and prejudice therefrom." *Id.* In order to show cause, the petitioner must "show that 'some objective factor external to the defense impeded

counsel's efforts' to raise the claim" in the earlier petition. *Id.* at 493 (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). Examples of such objective, external factors include "a showing that the factual or legal basis for a claim was not reasonably available to counsel," or that interference by officials made it impracticable to raise the claim previously. *Carrier,* 477 U.S. at 488, 106 S.Ct. 2639.

■ Once the petitioner has established cause, he must show that the errors of which he complains resulted in actual prejudice. *Id.* at 494, 106 S.Ct. 2639. This requires the petitioner to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Put another way, the petitioner must show "a reasonable probability that, but for [the] errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Schlup v. Delo,* 513 U.S. 298, 333, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (O'Connor, J., concurring) (quoting *Strickland* standard).

---

sel in state habeas proceedings. *See* 28 U.S.C.A. § 2261(a)—(c). Respondent does not argue that these provisions are applicable in this case, nor does it appear that Georgia provides for the appointment of counsel in state habeas proceedings in accordance with § 2261. *Cf. Cargill v. Turpin,* 120 F.3d 1366, 1369 n. 1 (11th Cir.1997) ("We note that the appellee has not asserted that the provisions of the [AEDPA], codified at chapter 154 of Title 28, 28 U.S.C. §§ 2261–66, apply to this case. Moreover, the AEDPA's relevant amendments to chapter 153 of Title 28 do not apply here.") (citations omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1529, 140 L.Ed.2d 680 (1998).

**7.** Although the instant Petition is nominally High's second habeas "petition," it is actually the third time he has sought habeas relief in this Court because he previously filed a motion for relief from judgment after his first petition was denied.

**8.** I note that Respondent has satisfied his burden of pleading abuse of the writ in this case: his

Answer sets forth High's prior writ history; identifies, to the extent possible, those claims that were not raised in his first federal petition; and alleges that this second federal Petition is an abuse of the writ. *See McCleskey,* 499 U.S. at 494, 111 S.Ct. 1454 (setting forth standard for pleading abuse of the writ).

In addition, Respondent alleges that High's claims are procedurally barred to the extent that the instant Petition asserts the same claims that he raised in his second state habeas petition, which the state court determined were procedurally defaulted. *See Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Because the same analysis applies in both the procedural-default and the abuse-of-the-writ contexts, however, *see McCleskey,* 499 U.S. at 493–94, 111 S.Ct. 1454, I will not directly address this aspect of Respondent's arguments.

■ If the petitioner cannot show cause, the Court nevertheless may proceed to examine the claim if the petitioner can show that failure to do so would result in a fundamental miscarriage of justice. *McCleskey,* 499 U.S. at 494–95, 111 S.Ct. 1454. As the Supreme Court recently emphasized, however, this exception is narrow in scope and is concerned with the petitioner's actual innocence as compared to his technical or legal innocence. *Calderon v. Thompson,* —— U.S. ——, 118 S.Ct. 1489, 1502–03, 140 L.Ed.2d 728 (1998). To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial, *id.* at 1503, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *Schlup,* 513 U.S. at 324, 115 S.Ct. 851. The petitioner's burden varies depending upon the nature of his challenge:

> If the petitioner asserts his actual innocence of the underlying crime, he must show it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition. If, on the other hand, a capital petitioner challenges his death sentence in particular, he must show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of the new evidence.

*Thompson,* 118 S.Ct. at 1503 (internal quotation marks and citations omitted).

■ A similar analysis applies to the extent that High's Petition raises successive claims, *i.e.,* ones that were adjudicated on the merits in his first federal habeas petition. Although traditional principles of *res judicata* are inapplicable in habeas proceedings, *see Schlup,* 513 U.S. at 317–18, 115 S.Ct. 851, a court should entertain successive claims only in those "rare circumstances" when the "ends of justice" would be served by considering them again. *Kuhlmann v. Wilson,* 477 U.S. 436, 451, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (plurality opinion). The Supreme Court has at times equated this ends-of-justice inquiry with the fundamental-miscarriage-of-justice exception. *See Schlup,* 513 U.S. at 320–23, 115 S.Ct. 851; *McCleskey,* 499 U.S. at 495, 111 S.Ct. 1454; *see also Wilson,* 477 U.S. at 454, 106 S.Ct. 2616 ("[T]he 'ends of justice' require federal courts to entertain [successive] petitions *only* where the prisoner supplements his constitutional claim with a colorable showing of factual innocence.") (emphasis supplied) In *Sawyer v. Whitley,* however, the Court made clear that successive claims should be examined under the same framework employed in the abuse-of-the-writ and procedural-default contexts:

> Unless a habeas petitioner shows cause and prejudice, a court may not reach the merits of: (a) *successive claims* that raise grounds identical to grounds heard and decided on the merits in a previous petition; (b) new claims, not previously raised, which constitute an *abuse of the writ;* or (c) *procedurally defaulted claims* in which the petitioner failed to follow applicable state procedural rules in raising the claims. . . .
>
> [E]ven if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of the successive claims if the failure to hear the claims would constitute a "miscarriage of justice."

505 U.S. at 338–39, 112 S.Ct. 2514 (citations omitted); *see also Johnson v. Singletary,* 991 F.2d 663, 667 (11th Cir.1993) (applying *Sawyer* ).[9] Accordingly, I will examine High's successive claims—as well as his previously unasserted claims—under this framework.

---

**9.** I note in passing that it is unclear what constitutes "cause" for bringing a successive claim. Logically, the term cannot have the same meaning in both the successive-claim and the abuse-of-the-writ contexts: in the latter context, the existence of cause turns upon the petitioner's reasons for not raising the claim in a prior petition; in the successive-claim context, on the other hand, the disputed claim was by definition raised in a previous petition. *See Lackey v. Scott,* 885 F.Supp. 958, 970 n. 9 (W.D.Tex.) (noting this logical inconsistency), *rev'd on other grounds,* 52 F.3d 98 (5th Cir.), *rev'd,* 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995). Although the Eleventh Circuit apparently has not addressed the issue, the Ninth Circuit has interpreted cause in this context as requiring the petitioner to "show cause for seeking review of the same claim twice—such as the discovery of new facts, or an intervening change in the law, that warrants reexamination of the same ground for relief raised in an earlier petition." *Campbell v. Blodgett,* 997 F.2d 512, 524 (9th Cir.1992).

## III. ANALYSIS

I must state at the outset that although High sets forth twelve enumerated "claims" in his Petition, divining the exact scope of each claim has proven somewhat difficult because he asserts multiple allegations of error within the confines of each enumerated "claim." Nevertheless, I have endeavored to address all of High's substantive claims and determine whether they are barred either as successive or as abusive claims.

### A. Claims 1–4: The Missing Film

These claims principally derive from a filmed interview of High that took place on August 29, 1976, two days after his arrest.[10] This interview lasted approximately one-half hour and was conducted inside the Richmond County jail. Although the interview took place shortly after High's arrest and long before his trial, the film itself was not produced until 1991, when it was discovered in the custody of the Georgia Board of Pardons and Paroles. High contends that the film was deliberately suppressed because it is exculpatory in many ways and because it contradicts the State's evidence presented at his trial.

High's allegations surrounding the filmed interview are more easily understood in light of the trial testimony about his confessions. Three witnesses testified that High had confessed to the kidnapping and murder of Bonnie Bulloch.[11] First, J.B. Dykes, an Investigator with the Richmond County Sheriff's Department, testified that High confessed his participation in the Taliaferro County crimes shortly after his arrest. (Trial Tr. at 607–08).[12] According to Investigator Dykes, High stated that he, Judson Ruffin, and Nathan Brown

had been involved in a robbery at a gas station in Crawfordville and that he had placed the—he called it the older man—in the trunk of the car and the young boy in the car with him in the back seat, and that they had gone to a place that Judson Ruffin had known ahead of time. He thought the boy was young, but he kept asking, Are you ready to die? Do you want to die? And he said the boy would beg, and he said Well, you're going to die.

He stated that they went to this place off the road and that they all started shooting—that they started shooting with pistol and one had a shotgun. And after this incident they came back to Richmond County.

(Trial Tr. at 608–09). Dykes also testified that High requested a television interview after giving this statement, and that investigators acceded to this request.

Second, Robert Ingram, an Agent with the Georgia Bureau of Investigation (GBI), testified that High made a detailed statement to him shortly before the "television"[13] interview. (Trial Tr. at 780–82).[14] The substance of High's confession as related by Ingram was essentially the same as the confession related by Dykes, except that Ingram's version contained no reference to any communication between High and Bonnie Bulloch prior to the boy's death. (Trial Tr. at 784). Ingram also testified that after making this statement, High told him that he was the leader and organizer of a "family" whose activities were conducted within and without the state of Georgia. (Trial Tr. at 786).

Finally, GBI Agent M.E. Monahan testified that both he and Investigator Dykes were present when High made his confession

---

10. High was arrested for unrelated crimes in Richmond County, Georgia, on August 27, 1976. The legality of High's arrest was upheld on appeal. *See State v. High*, 145 Ga.App. 772, 774, 244 S.E.2d 888 (1978).

11. It should be noted, however, that High's confessions were not the only items of evidence presented against him. Indeed, the prosecution presented significant other evidence against High, notably the eyewitness testimony of Henry Lee Phillips, the surviving victim, who identified High as a participant in the crimes.

12. Neither party filed a copy of High's trial transcript in connection with this proceeding. A copy was filed, however, as Respondent's exhibit 4 in High's first federal habeas petition, Civil Action No. 185–41. The references herein to "Trial Tr." are references to that exhibit.

13. I have placed quotation marks around the term "television" because the interview was never actually broadcast on television.

14. Agent Ingram further testified that he wrote down what High told him and then had High sign the written statement.

to Agent Ingram. (Trial Tr. at 647). All three of these witnesses testified that High made his statements voluntarily after having had his rights explained to him. Indeed, High signed a written waiver of his right to counsel before giving his statement to Agent Ingram.

The "television" interview was conducted primarily by Investigator Dykes and William Anderson, who at the time was the Sheriff of Richmond County. Dykes testified that he and High prepared a list of twenty-two questions that High wanted to be asked during the interview.[15] Agents Ingram and Monahan testified that they were present during most of the questioning, as were several other law enforcement officials. In addition, Jay Mann, the cameraman from the local television station that supplied the necessary equipment, was present during the interview.

Little of what High said during this interview was presented to the jury: Agent Ingram testified that High made a brief reference to the Crawfordville crimes during the interview, (Trial Tr. at 787–88), and Agent Monahan testified in general terms that High had stated that he was the leader of an organization and that he and members of that organization had committed the murder of Bonnie Bulloch. (Trial Tr. at 649). A more extensive description of the "television" interview was given by Investigator Dykes outside the presence of the jury. Dykes testified that High had stated during the interview that he was the leader of a crime family that had killed four and one-half people in Georgia, with the "one-half" person being a reference to Bonnie Bulloch's stepfather, Henry Lee Phillips. (Trial Tr. at 564–65). Dykes further testified that High had repeated some his earlier statements about the Crawfordville crimes:

A. In that interview, he did not outline the specific crimes, but he made relationships to different ones that the family had committed. He would say—He stated in that interview about the boy begging for his life.

Q. That was in the television interview?

A. Yes. All these things he had told us prior.

(Trial Tr. at 565). Dykes also testified that although he told High that the interview was being conducted for television, he also informed him that it would not be shown on television until after his trial. (Trial Tr. at 564).

Neither High nor his counsel had access to the film of the interview prior to or during the trial, and the prosecution's witnesses testified that they did not know the film's whereabouts. Some light was shed on this issue during the 1991 state habeas hearing: Former Sheriff Anderson testified that after the interview, he and Jay Mann went to the television studio in order to process and develop the film. The station's equipment was not functioning, however, and therefore he left the film with Mann. The developed cannisters of 16–mm film were returned to Anderson some time later, and Anderson in turn placed the cannisters in a footlocker in the trunk of his patrol car. When Anderson left office on December 31, 1976, he took the footlocker home with him and placed it in storage. Anderson claims that he forgot that the film was in his footlocker until 1983 or 1984,[16] when he was contacted by William Wilcher, a Parole Officer who was conducting a routine investigation into High's case. Anderson turned the cannisters over to Wilcher and they were then placed in the custody of the Parole Board. The film remained in the Parole Board's files until a request was made by High's counsel under the Georgia Open Records Act in 1991. Pursuant to that request, the film was converted to VHS video format and provided to High and his counsel.

Before proceeding any further, I wish to address briefly the parties' frequent references to this interview as a "videotaped" interview. Presumably, the parties use this label because the film is presently contained on a VHS videotape. It should be emphasized, however, that what is contained on the videotape was originally a cinematographic recording of High's interview stored on three cannisters of 16–mm film. It should not be

---

15. This list of questions was submitted to the jury—without answers—as State's Exhibit 21.

16. During a 1977 hearing in the Superior Court of Richmond County concerning the legality of High's arrest, Anderson testified that he had not seen the film since the time of the interview.

inferred from the parties' references to a "videotape" that this film could have been developed and copied easily in 1976. To be sure, early technology in the field was on the market at the time, but the equipment was far more cumbersome and more rarely seen than it is today. While cassette-type audio recording technology was fairly well advanced, the now ubiquitous "camcorder" video recording technology was then an almost futuristic concept. Indeed, the investigators needed the assistance of a professional television cameraman simply to set up and operate the necessary equipment. Thus, although the parties often refer to this interview as having been videotaped, I believe it is more accurate to refer to it as having been filmed, for the sequence of events must be viewed in the proper chronological and technological context. An easily reproducible videotape was quite a novelty just twenty years ago.

High makes numerous allegations of error stemming from the alleged suppression [17] of the film. First and foremost, High contends that the film is exculpatory because it reveals that, contrary to the testimony at his trial, he (a) professed his innocence of Bonnie Bulloch's murder, (b) claimed he tried to stop Ruffin and Brown from killing the boy, and (c) showed remorse about the killing. Second, High alleges that the film shows that he was mentally ill at the time of the interview and at the time of the crimes themselves; he proffers expert testimony to the effect that, based upon the film and an evaluation of his personal and social history, he did not act with the requisite criminal intent and his inculpatory statements were coerced. Third, High claims that the film shows, contrary to Dykes's testimony, that High said nothing during the "television" interview about Bonnie Bulloch begging for his life or about taunting the boy over his impending death. High also asserts that other evidence reveals Dykes's questionable credibility,[18] and he therefore contends that Dykes fabricated material portions of his testimony about High's confession.

### 1. Cause

■ High concedes that he did not raise these allegations in his first federal petition. He contends, however, that he was prevented from doing so because the film was not provided to him until 1991, some six years after he filed that petition. Thus, High argues, he has shown cause for failing to raise these claims earlier. However, even though the film may well have been unavailable to High—indeed, even assuming the film was intentionally withheld and suppressed—it does not automatically excuse High's failure to raise these claims in his first federal habeas petition. Instead, "the question is whether [High] possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." *McCleskey*, 499 U.S. at 498, 111 S.Ct. 1454. Although the film was not available to High, the purportedly exculpatory evidence it reveals was reasonably available to him.

17. Although High does not seem to contest the above-described sequence of events, he contends that the film was deliberately suppressed; Respondent, of course, contends that the film was inadvertently misplaced. I need not resolve this dispute, however, because it is immaterial for purposes of this Order whether the film was suppressed or misplaced. Although this issue would be relevant in considering the merits of High's claims, it is of little import in deciding whether High has shown cause for failing to raise these claims in his first habeas petition. The cause inquiry focuses not upon whether the film was suppressed or simply misplaced, but rather upon whether the factual and/or legal basis for the claims were reasonably available at the time High filed his first federal petition.

18. High points to the opinion of a handwriting expert who declares that High did not, as Dykes testified, write 18 of the 22 questions contained in State's Exhibit 21. Furthermore, High claims that the film reveals that some two-hundred questions, rather than the twenty-two questions on the list, were asked of High during the "television" interview.

High also argues that Dykes is not credible because he pleaded guilty to federal felony charges in 1984. Although Dykes's criminal record may reflect on his overall credibility, this *subsequent* conviction is not logically related to Dykes's credibility at the time of High's trial. That is, the fairness of High's trial could not have been affected by the exclusion of this information because Dykes had not yet been convicted. Furthermore, even assuming that this evidence is somehow relevant, it does not support a finding, under either a more-likely-than-not or a clear-and-convincing standard, that no reasonable juror would have convicted High and sentenced him to death, even when considered with High's other proffered "evidence."

For purposes of this inquiry, it is helpful to divide High's claims into two categories: (1) those based upon what High said or did not say during the interview, and (2) those based upon High's demeanor as revealed by the film. Most of High's allegations fall within the first category. With respect to these claims, High clearly was on notice that either a cassette or reel-type *audiotape* of the interview existed at the time of his trial. Agent Ingram displayed some confusion as to nomenclature but clearly stated that he had a "tape recording," meaning an audio recording, in his possession at the time of High's trial:

[Ruffin]. Now, Mr. Ingram, where is the tape?

A. Which tape, sir?

Q. The tape that was made as a result of the TV simulation.

A. The tape recording?

Q. Well, where is the tape recording?

A. In my pocket.

Q. How long has it been in your pocket?

A. Since yesterday.

Q. Where did you get it?

A. From Mr. Richard Allen, the District Attorney [of the Augusta Judicial Circuit].

Q. Mr. Richard Allen?

A. Yes, sir.

Q. Now, where is the audio tape?

A. I'm not familiar with that.

(Trial Tr. at 794). The confusion during the latter part of this exchange is evident. Nevertheless, Agent Ingram clearly stated that he had a "tape recording" of some kind in his possession at the time of High's trial.[19] Even assuming that, as High contends, his

trial counsel asked for the tape of the interview and was refused access,[20] it does not excuse his failure to raise the issue and pursue these claims in his first federal petition. Indeed, if High's counsel did ask for the tape, it provides an even stronger reason for concluding that these allegations could have been raised in the previous petition.

Moreover, the supposedly exculpatory evidence consists of nothing more than High's own statements made during the course of the "television" interview. High knew what he had told the investigators during that interview, and therefore he "has had at least constructive knowledge all along of the facts he now claims to have learned only from the [film]." *McCleskey*, 499 U.S. at 500, 111 S.Ct. 1454. In other words, High was not prevented from learning the facts underlying these claims by the State's putative suppression of the film. Thus, the fact that High did not have access to the film, or even to the audiotape, does not establish cause for failing to raise and pursue these claims in his first federal habeas petition. *See id.* at 502, 111 S.Ct. 1454.

Similarly, High cannot show cause for failing to raise claims based upon his demeanor on the film, *i.e.*, his claims that the film shows that he was mentally ill and that his statements were coerced. Again, even assuming that the State deliberately suppressed the film, the suppression did not prevent High from raising claims related to his mental state in his first federal petition; for if these allegations are to be given any credence, they relate to matters that should have been apparent to counsel and therefore raised in that petition.[21] Although the film

---

**19.** During the 1991 state habeas hearing, Ingram testified that it was the audiotape of the interview that he had in his pocket at High's trial. (State Habeas Tr. at 123). In the parlance of the time, "tape recording" meant an audio recording.

**20.** There seems to be some dispute as to whether a tape was ever requested by High's trial counsel. I need not resolve this issue, however, because I am assuming for purposes of this Order that some request was made. Furthermore, I note that High does not allege that his first habeas counsel requested the tape.

In addition, I note that Dennis Sanders, who was part of the prosecution team at High's trial, testified during the 1991 state habeas hearing that the prosecution had a transcript of the au-

diotape in its file during the trial. (State Habeas Tr. at 136).

**21.** Indeed, these allegations seem to be a much-belated attempt to raise an insanity defense. For obvious reasons, such allegations are more properly raised at the time of trial, not two decades later after multiple attempts to overturn the conviction have failed.

Along these lines, I note that High's trial counsel claims that he did not specifically request an examination because High had already been examined under court order in the fall of 1977, and thus he believed the trial court would not order another examination at state expense. (State Habeas Tr. at 270–71). He further claims that *if* he had viewed the film, and *if* he had been made

may not have been available at that time, other information about High's personal history—which is heavily relied upon in support of High's present allegations of mental illness—has been available all along. Indeed, High's cause argument rings especially hollow in light of his trial counsel's assertion that he attempted to obtain a psychiatric evaluation *pro bono* but was unable to do so. (State Habeas Tr. at 270–71). In any event, the fundamental point is that the putative concealment of the film did not conceal High's alleged mental illness, and thus it did not prevent High's counsel from pursuing these claims in the first federal petition.

Furthermore, with respect to High's claims that the film reveals coercion, I note that High challenged the voluntariness of his confessions in claim I of his prior petition. The film of High's "television" interview does not justify reconsidering this challenge. In considering this issue, it should be emphasized that the confessions related by Investigator Dykes and Agent Ingram were separate statements that High gave *prior* to the filmed interview; the television interview played a far less significant role in the trial than High now seems to argue.[22] Any evidence of coercion revealed by the film would be relevant only insofar as it supports an inference that High's prior confessions had been obtained involuntarily. The "evidence" of coercion on the film, however, is plainly insufficient to support such an inference.

High alleges that the film reveals that he did not waive his rights because, when asked if he has done so, he pauses and is then told that he did. (Pet. at 17). This is an incomplete account of the relevant exchange. A full account of that exchange supports the testimony of Dykes, Ingram, and Monahan that High knowingly and willingly provided his statements:

Q. You realize that none of this film is going to be shown until after your trials, don't you?

A. Yes.

Q. Did I inform you of that?

A. Yes.

Q. What else did I inform you of? Did I inform you of your rights?

A. Yes.

Q. Did you sign a rights form prior to this?

A. [High hesitates and appears confused]

Q. I have a copy. Did you sign that? Or, you know, I don't ... I'm trying to keep myself out of jail.

A. I signed it because I had nothing else to do.

Q. Thank you.

High also relies upon the above-mentioned expert testimony to argue that High's mental state at the time of the interview contributed to and enabled the alleged coercion. High's evidence, however, is simply insufficient to justify renewed consideration of his challenge to the voluntariness of his prior confessions. Thus, High has not shown cause to excuse his failure to raise the allegations in claims 1–4 in his first federal habeas petition.[23]

### 2. *Fundamental Miscarriage of Justice*

The filmed interview of High, even when considered with the allegations in his Petition, does not support a finding that a fundamental miscarriage of justice will result if these claims are not considered on the

---

aware of some other information that High allegedly told the doctors who examined him, (*see infra* Part III.D), then he would have made more diligent efforts to procure the services of a psychiatrist. (State Habeas Tr. at 270–71). Even giving credence to this speculative, *ex post facto* assertion, it does not reveal that there were any external impediments to raising these claims.

**22.** I must also note the inconsistency in High's arguments: on one hand, he contends that his statements on the film are exculpatory; on the other hand, he argues that the statements he makes on the film must be ignored because he was mentally ill and because the statements were coerced.

**23.** Additionally, to the extent High challenges the authorship of State's Exhibit 21—the list of questions that, according to the testimony at trial, High wanted to be asked during the "television" interview—High makes no attempt to show cause for failing to raise the allegation in his prior federal petition, and there appears to have been no external impediment to raising that claim. Indeed, it is worth noting that in his prior petition High did challenge the prosecutor's references to Exhibit 21 during closing argument; the Eleventh Circuit held that the references did not affect the fairness of High's trial. *See High v. Kemp*, 819 F.2d at 995–96.

merits. First, contrary to the express assertions in High's Petition, he does not profess his innocence of Bonnie Bulloch's murder on the film, nor does he claim that he tried to stop Ruffin and Brown from killing the boy. Rather, the statements on the film are directly inculpatory and highly inflammatory.[24] In support of his allegations, High quotes the following exchange:

> High: Yes. He was too young. But what's done is done.
>
> Dykes: You didn't have control enough to stop them from taking his life?
>
> High: Not then.

(Pet. at 16) (emphasis supplied by High). The inference High wishes to be drawn from this snippet of dialogue is that High tried to stop Ruffin and Brown from killing Bonnie Bulloch but was unable to do so because he did not have complete control over them at the time. A complete version of the colloquy between High and his interviewers, however, reveals that High's statements on the film strongly support his conviction and sentence:

> Q. Did you receive any pleasure ... As you stated one time that a black female in one of these instances begged for her life ... Said she would do anything, just don't hurt me. Did you receive any pleasure personally in knowing that they were afraid of you and that you had control over their life and you could ice them if you wanted to?
>
> A. No, well, number one, see, the only way they would get iced is they would look in our face.
>
> Q. Only if they looked at your face?
>
> A. Right. And if they would look me in the eye I know they could identify me. That's why if they ever look in my eye, I would get rid of them.
>
> Q. Did you have any feelings about the young boy [Bonnie Bulloch]? Did he look in your eye?
>
> A. No, he didn't.
>
> Q. Did you have any feelings about him?

> A. Yes. He was too young. But what's done is done.
>
> Q. You didn't have control enough to stop them from taking his life?
>
> A. Not then.
>
> Q. In other words, when this happened, it was sort of ... You were gaining ...
>
> A. This was one of the first that they did *for me.*
>
> Q. And you could control them to the point where they would do what you told them ...
>
> A. Well, I knew that ...
>
> Q. ... but you didn't have one-hundred percent total control over them. Is that right?
>
> A. No. I wasn't positive about the first two.[25]
>
> Q. At that point.
>
> A. So, I figure if they will kill one person I know that I have enough to get them in a whole lot of trouble.

(emphasis supplied). This exchange is entirely consistent with the testimony presented to the jury at High's trial.

Furthermore, although High's comment that Bonnie Bulloch was "too young" seemingly indicates some remorse about the boy's murder, it does not present a clear and convincing showing that no reasonable juror would have sentenced High to death in light of that evidence, especially not in view of the entirety of that exchange. Moreover, Investigator Dykes testified that High had told him that he thought the boy was too young. (Trial Tr. at 609). Thus, the evidence that High now claims shows his remorse *was* presented to the jury.

High also claims that he is actually innocent because he was mentally ill at the time of the offense and therefore did not act with the requisite intent to kill. Even crediting the affidavits of High's newfound experts,

---

**24.** Indeed, had this film been presented to the jury by the defense at High's trial, it might well have supported a claim for ineffective assistance of counsel.

**25.** I note that the transcript of the interview submitted in the 1991 state habeas hearing indicates that High stated "No, that wasn't *possible* about the first two." (State Habeas Tr. at 742) (emphasis supplied). However, because that transcript is not an official one, I am relating High's statements as I interpret them from the film submitted to this Court. Moreover, this difference in interpretation is not material when considered in the overall context of this exchange.

however, High has not shown that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Indeed, this argument essentially puts forth an insanity defense years after High's trial. High's proffered expert testimony, based upon a fifteen-year-old film [26] and High's personal history that has been available all along, is insufficient to make a colorable showing of actual innocence.

High further contends that he has shown a fundamental miscarriage of justice because he has shown that Investigator Dykes was not a credible witness. The Supreme Court, however, has taken a dim view of evidence that merely impeaches prosecution witnesses. *See Thompson,* 118 S.Ct. at 1504 ("This impeachment evidence provides no basis for finding a miscarriage of justice. As in *Sawyer,* the evidence is a step removed from evidence pertaining to the crime itself."); *Sawyer,* 505 U.S. at 349, 112 S.Ct. 2514 ("This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness]'s account of petitioner's actions."). Even assuming that High had been able to use the film and his other "evidence" to impeach Dykes's testimony at trial, it does not follow that no reasonable juror would have voted to convict him in light of that evidence. Indeed, the prosecution presented significant evidence other than Dykes's testimony at trial, including physical evidence, High's confession to Agent Ingram, and a positive identification from the surviving victim. *Cf. Thompson,* 118 S.Ct. at 1505–06 ("To say that no reasonable juror would have convicted Thompson of rape if presented with Dr. Root's testimony, then, we would have to ignore the totality of evidence of Thompson's guilt. This we cannot do."). Moreover, the mere existence of impeachment evidence does not automatically translate into a showing that no reasonable juror would have believed Dykes's testimony even when presented with the new evidence. Thus, High's allegations do not support a finding that it is more likely than not that no

reasonable juror would have voted to convict him in light of the evidence that purportedly impeaches Dykes's credibility.

Finally, High argues he is innocent of the death penalty because he has shown that he did not taunt Bonnie Bulloch by asking him, "Are you ready to die? Do you want to die? Well, you're going to die." Repeated references have been made to these taunting statements by the courts that have upheld High's convictions. *See High v. Zant,* 916 F.2d at 1508; *High v. Kemp,* 819 F.2d at 990; *High v. Zant,* 250 Ga. at 695, 300 S.E.2d 654; *High v. State,* 247 Ga. at 296, 276 S.E.2d 5. High points out, however, that on the film he says nothing about having taunted Bonnie Bulloch. High also points out that Investigator Dykes was the only witness who testified that High had confessed to taunting the boy, and that Dykes also testified that High had repeated those statements during the "television" interview. High asserts that he has shown Dykes to be an unreliable witness, and he further claims that the taunting was the only aggravating circumstance that supported the imposition of the death penalty. Therefore, High contends, no reasonable juror could have found him eligible for the death penalty because no reasonable juror could have believed Dykes's testimony about High's confession.

This argument fails for two reasons. First, the taunting of Bonnie Bulloch was not the only aggravating factor found by the Georgia Supreme Court to support the jury's finding that High was eligible for the death penalty: the court also found that Bonnie Bulloch's age and size were relevant considerations, and it further found that the kidnapping and murder were distinguishable from ordinary kidnappings and murders because the boy had no relationship to High and had not provoked the attack in any way. *High v. State,* 247 Ga. at 296–97, 276 S.E.2d 5. Second, and more importantly, High has not shown by clear and convincing evidence that, had the jury been presented with this evidence, *no reasonable juror would have* believed Dykes's testimony about High's confession. That is, even if High had been able to bring out the inconsistencies in Dykes's

---

**26.** The affidavits relied upon by High were submitted in connection with the state habeas hearing in September 1991. The television interview, it will be recalled, took place on August 29, 1976.

testimony about the film as well as the remainder of his impeachment evidence, it does not support a clear and convincing finding that no reasonable juror would have chosen to believe Dykes's account of High's original confession. Thus, High has not shown that he is "innocent of the death penalty," and therefore he has not shown that a fundamental miscarriage of justice will result if this claim is not considered on the merits.

In summary, even assuming that the film was intentionally withheld from High and his counsel, High was not prevented from raising the allegations in Claims 1–4 in his first federal habeas petition. Furthermore, High does not show that a fundamental miscarriage of justice will result if these claims are not addressed on the merits. Therefore, these claims are barred as an abuse of the writ.[27]

## B. Claim 5: Pretrial Counsel's Conflict of Interest

High argues that his pretrial counsel, Walton Hardin, labored under a conflict of interest. Hardin was appointed by the Superior Court of Taliaferro County to represent High and his accomplices, Judson Ruffin and Nathan Brown, in March 1977.[28] In February 1978, High retained John H. Ruffin, Jr. (who is now serving on the Georgia Court of Appeals and is not related to High's accomplice) to represent him while Ruffin and Brown continued to be represented by Hardin.[29] Because of Hardin's conflicted representation, Ruffin and Brown each had their conviction and sentence set aside on federal habeas review. *Ruffin v. Kemp,* 767 F.2d 748, 752 (11th Cir.1985); *Brown v. Kemp,* No. CV 188–027 (S.D.Ga. Apr. 25, 1989). High now contends that his conviction and sentence must be set aside for the same reason.

■■■■ High concedes that he failed to raise this claim in his first federal habeas petition. As cause for the default, High sub-

mits that his counsel in that proceeding was unaware that Hardin had represented all three defendants and that he did not investigate the issue because of his inexperience. The ineffectiveness of habeas counsel, however, cannot constitute cause:

> Counsel's ineffectiveness will constitute cause only if it is an independent *constitutional* violation, and there is no *constitutional* right to counsel in habeas proceedings. Thus, no error by habeas counsel can ever constitute cause for abusing the writ.

*Callins v. Johnson,* 89 F.3d 210, 212 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 530, 136 L.Ed.2d 416 (1996) (internal quotation marks and citations omitted); *see also Hill v. Jones,* 81 F.3d 1015, 1024 (11th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 967, 136 L.Ed.2d 851 (1997). Thus, High cannot show cause as a matter of law for failing to raise this claim in his first federal petition.

■■■■ Furthermore, High cannot show that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Even assuming that Hardin's pretrial representation of High amounted to an error of constitutional dimension, it does not tend to show that High was actually innocent of the crimes for which he was convicted, nor does it tend to show that High was ineligible for the death penalty. Indeed, this claim is one of "legal innocence," which the Supreme Court has emphasized is not the proper focus of the miscarriage-of-justice inquiry.[30] *See Thompson,* 118 S.Ct. at 1502–03. This claim therefore is barred as an abuse of the writ.

## C. Claim 6: The Emotionally and Racially Charged Atmosphere Surrounding High's Trial

High contends that several independent constitutional violations are encompassed within this claim. Although these purported sub-claims are not precisely enumerated, I

---

**27.** Additionally, to the extent these claims are successive, I decline to readdress them.

**28.** Although he was arrested and indicted in Richmond County in August 1976, High and his accomplices were not officially indicted by the Grand Jury of Taliaferro County until February 1977.

**29.** It is worth noting, however, that Ruffin also represented High in connection with the Richmond County charges.

**30.** Moreover, the important event was the trial itself; High's employment of Mr. Ruffin prior to trial assured that High had separate, independent counsel, untainted by conflict of interest, throughout the trial.

have gleaned the following allegations from High's Petition: (1) High was denied a fair trial because of extensive pretrial publicity and because of an extreme and unwarranted police presence during the trial itself; (2) the prosecutor improperly used peremptory strikes to exclude blacks from High's jury in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (3) the prosecutor improperly excluded several black jurors because of their opposition to the death penalty in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (4) the trial judge failed to compel disclosure of the relationships among prospective jurors, the prosecutor, and the trial judge himself; and (5) the prosecutor impermissibly interjected race into his arguments during both the guilt-innocence phase and the sentencing phase of High's trial.

 Many, if not all, of these claims were considered and rejected in High's first federal petition: in claim C of that petition, High alleged that several potential jurors were excluded in violation of *Witherspoon;* in claim E, High challenged the prosecutor's use of peremptory strikes;[31] in claim G, High alleged that the trial venue should have been changed because of pretrial publicity; in claim J, High challenged, *inter alia,* the denial of his motion to compel the disclosure of relationships between the prosecutor, the trial judge, and prospective jurors; and in claims O and P, High extensively challenged the propriety of the prosecutor's closing argument in the guilt-innocence phase and in the sentencing phase of his trial. High makes no attempt to show a justification for renewed consideration of these claims, nor does he show that a fundamental miscarriage of justice will occur if they are not readdressed. Therefore, I will not consider these successive claims.

 Furthermore, to the extent, if any, that High presents new allegations of error, he shows no cause for failing to raise them in his first federal petition. In his Brief, High

seems to attribute the default of these claims to the ineffectiveness of his first habeas counsel. (*See* Pet'r Br. at 34 n. 47 ("Petitioner seeks an evidentiary hearing to show that he earlier acted with due diligence and that there is cause for not having raised the claim earlier.")). As previously explained, however, the ineffectiveness of habeas counsel cannot constitute cause in the abuse-of-the-writ context. Moreover, High points to no external impediment that prevented him from raising these claims; indeed, it is the very overtness of the alleged errors that High contends affected the outcome of his trial. Finally, High has not shown that a fundamental miscarriage of justice will result if these claims are not considered on the merits: his allegations do not tend to show his actual innocence of the crimes, nor do they tend to show his ineligibility for the death penalty. Thus, these claims are barred as an abuse of the writ.

### D. Claim 7: Denial of Independent and Competent Assistance of Mental Health Experts

The only pretrial psychiatric examination of High was conducted during the fall of 1977 when, at the request of High's counsel, John Ruffin, he was examined by Dr. Everett C. Kuglar and Dr. James B. Craig of Georgia Regional Hospital. Dr. Kuglar and Dr. Craig each submitted a report to the trial court, the prosecutor, and defense counsel. Ruffin did not request further examination in connection with the Taliaferro County charges[32] because he believed the requisite funds would not be provided and because he was unable to locate a psychiatrist to conduct an examination *pro bono.* High now claims that the examinations conducted by Dr. Kuglar and Dr. Craig did not adhere to appropriate professional standards and therefore violated his right to the independent and competent assistance of a mental health expert in violation of *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[33]

---

**31.** Indeed, the Eleventh Circuit expressly ruled on appeal that *Batson* does not apply retroactively to High's case. *High v. Kemp,* 819 F.2d at 992 (citing *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986)).

**32.** The examination was conducted in connection with the Richmond County charges.

**33.** In a footnote curiously inserted within the discussion of this claim, High further alleges that Dr. Kuglar and Dr. Craig failed to reveal "excul-

High did not bring this claim in his first federal Petition, and I conclude that he cannot show cause for his failure to do so. First, the legal basis for High's *Ake* claim was reasonably available at the time he filed his first federal petition: although *Ake* itself was not decided until two weeks after that petition was filed,[34] the Eleventh Circuit prior to *Ake* had "recognized an accused's constitutional right to psychiatric assistance under appropriate circumstances." *Magwood v. Smith,* 791 F.2d 1438, 1443 n. 9 (11th Cir.1986). Second, the factual basis for High's *Ake* claim also was reasonably available at the time the first petition was filed. As explained in Part III.A, *supra,* there was no external impediment that prevented claims relating to High's mental state from being raised and pursued in his first federal petition: if High was and is as mentally ill as is now being suggested, his first habeas counsel should have been on notice to pursue such claims in that proceeding.[35]

Furthermore, High has not shown that failure to consider this claim will result in a fundamental miscarriage of justice. As with many of his other claims, High's *Ake* claim—that he was denied his right to the assistance of a competent and independent mental health expert—is a claim of legal innocence that does not tend to show his actual innocence of the crimes or his actual ineligibility for the death penalty. As noted previously, however, High also alleges that Dr. Kuglar and Dr. Craig failed to reveal certain "exculpatory" information in their reports; specifically, High alleges that they failed to include the following: (1) High stated that he had almost "cracked up" two years prior to his arrest; (2) High was acting "grandiose"; (3) High stated that he had tried to kill himself twice; (4) High stated that he had been using cough syrup prior to

his arrest to help himself sleep; (5) High stated that his accomplice Judson Ruffin had dominated him; (6) High was not oriented as to time and date; (7) "[High]'s affect was inappropriate"; and (8) High stated his belief that the judge and jury were "in on" a plan to "railroad" him. In addition, High points to the expert affidavits that he submitted in connection with the 1991 state habeas hearing, in which it is opined—based upon High's personal and social history and the film discussed in Part III.A, *supra*—that High did not commit the crimes to which he confessed and that in any event, he was mentally ill at the time and did not act with the requisite degree of mental culpability to support a conviction and/or death sentence.

High contends that this evidence establishes that failure to consider these claims will result in a fundamental miscarriage of justice. This is essentially the same argument that High made—and that I rejected—in connection with Claims 1–4 of the instant Petition. Even assuming the veracity of these allegations and opinions, they are not sufficient, considered with the other evidence presented at High's trial and sentencing, to support a finding that it is more likely than not that no reasonable juror would have convicted High, much less that no reasonable juror would have found him eligible for the death penalty. Thus, I conclude that this claim is barred as an abuse of the writ.

### E. Claim 8: The Prosecutor's Invocation of God, Religion, and the Bible During Trial

High alleges that he was denied a fair trial because the prosecutor invoked God, religion, and the Bible during his opening and closing arguments. High concedes that the propriety of the prosecutor's closing

---

patory" information in their reports in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that their shortcomings rendered Ruffin's representation constitutionally ineffective, and that they rendered the resolution of issues based upon High's mental state "fundamentally unreliable." (Pet. at 100 n. 39). High's statement of Claim 7, however, appears to state only a claim under *Ake:* "Petitioner was denied his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights to the Independent, Competent Assistance of Mental Health Experts." (*Id.* at 99).

This concise statement provides no hint of these supplemental allegations.

**34.** High filed his petition on February 12, 1985; *Ake* was decided on February 26, 1985.

**35.** Furthermore, to the extent High attempts to raise other allegations of error in Claim 7 in addition to his *Ake* claim, *see supra* note 33 (describing other claims), he does not show cause for failing to raise them earlier.

argument was decided adversely to him in his first federal petition; nevertheless, High contends, this Court should revisit this claim because the Eleventh Circuit has since chastised the same prosecutor for the improper content of his closing argument.[36] *See Cunningham v. Zant,* 928 F.2d 1006, 1019–20 (11th Cir.1991). However, the fact that the Eleventh Circuit disapproved of the prosecutor's arguments in a subsequent case does not constitute cause sufficient to justify reconsidering this claim. Indeed, this Court and the Eleventh Circuit already have extensively considered the propriety of the prosecutor's closing arguments and concluded that they did not render High's trial and sentencing fundamentally unfair. *High v. Kemp,* 819 F.2d at 995–96, *aff'g* 623 F.Supp. at 322–24. Moreover, to the extent that High challenges new portions of the prosecutor's argument, he does not even attempt to show cause for his failure to raise the allegations in his first federal petition. Furthermore, High cannot show that failure to hear these claims will result in a fundamental miscarriage of justice, as these allegations, like most of his others, do not tend to establish his innocence of the crimes or his ineligibility for the death penalty. Therefore, to the extent these claims are successive, I decline to address them; to the extent they were not raised in

High's first federal petition, they are barred as an abuse of the writ.

## F. Claim 9: The Prayer Session

■ High alleges that three jurors impermissibly participated in a prayer session with a bailiff and that this prayer session exacerbated the prosecutor's allegedly improper religious references. High did not bring this claim in his first federal petition, and it is unclear what he contends constitutes cause for the default: in his Brief, High makes no more than an unsubstantiated assertion that "prior counsel was unable to discover or raise the issue." (Pet'r Br. at 38).[37] This is insufficient to satisfy his burden of showing cause.

■ Furthermore, even assuming that High has shown cause for failing to raise these claims previously, he has not shown prejudice resulting from these alleged errors. Accepting his allegations as true, High has shown at most a mere possibility of prejudice; he has not shown a reasonable probability that, but for the prayer session and the prosecutor's putatively improper remarks, the outcome of his trial and sentencing would have been different.[38] Therefore, this claim is barred as an abuse of the writ.[39]

36. High also contends that the propriety of the prosecutor's closing argument should be reconsidered in light of Claim 9 of the instant Petition, in which High alleges that members of the jury engaged in a prayer session with a bailiff. I will consider this argument in connection with that claim.

37. I note that in making this assertion of cause, High does refer to an earlier portion of his Brief in which he contends that the ineffectiveness of High's first habeas counsel constitutes cause. As previously explained, however, the ineffectiveness of habeas counsel cannot constitute cause. *See Callins,* 89 F.3d at 212.

38. Because I conclude that High cannot meet the standard for prejudice, it necessarily follows that he cannot make the showing required to establish a fundamental miscarriage of justice. *See Schlup,* 513 U.S. at 332, 115 S.Ct. 851 (O'Connor, J., concurring) (emphasizing that prejudice standard is lower than standard for miscarriage of justice).

39. In addition, I wish to note that while High's arguments focus upon the impropriety of a pray-

er session led by a court official, his arguments seem to go further, intimating that religion should play no role whatsoever in the sentencing decision. (*See* Pet. at 157–58). I reject any suggestion that a jury's decision cannot stand because one or more jurors privately invoked the wisdom and aid of the Almighty. Indeed, in support of this claim High relies principally upon *Jones v. Kemp,* 706 F.Supp. 1534, 1558–60 (N.D.Ga.1989), in which the court found it unconstitutional to permit the Christian Bible in the jury room for apparent use during the deliberative process. That same court, however, emphatically stated that it was not improper for jurors to seek individual spiritual guidance in reaching their decision:

> The court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen.

*Id.* at 1560. Thus, High's more extreme contentions are not supported even by this purportedly favorable case.

### G. Claim 10: Jury Instructions on Mitigating Circumstances

High contends that the trial judge's instructions did not adequately explain the nature and function of mitigating circumstances to the jury. High concedes that he raised this claim in his prior federal petition; indeed, this Court mistakenly granted him relief on these grounds, *High v. Kemp*, 623 F.Supp. at 327–28, and the Eleventh Circuit later reversed. *High v. Kemp*, 819 F.2d at 990–92. High argues that this claim should now be reexamined because the Eleventh Circuit based its holding upon the erroneous premise that there were no mitigating circumstances for the jury to consider, when in fact "significant" mitigating evidence was presented during the guilt-innocence phase of his trial.

High's cause argument, however, is itself based upon a faulty premise—that the Eleventh Circuit predicated its holding upon its view that no mitigating circumstances had been presented. The court did declare that "High presented no evidence [of mitigating circumstances] at either the guilt or sentencing phase of his trial." *Id.* at 991. The court made that observation, however, in response to High's attempt to distinguish the jury instructions in his case from those found constitutional in *Peek v. Kemp*, 784 F.2d 1479 (11th Cir.1986):

> The only distinguishing factor between the instructions given here and the instructions held to be adequate in the *Peek* decision is that the trial judge in *Peek* gave concrete examples of a mitigating and aggravating factor. Had this been done at High's trial, such an instruction would have emphasized the fact that there were no mitigating circumstances to be found.

819 F.2d at 991. Indeed, before addressing that aspect of High's argument, the court expressly concluded that "[a]n evaluation of the instruction given at High's trial ... reveals that the instructions sufficiently informed the jury as to the nature and function of mitigating circumstances." *Id.* The court

next proceeded to examine the instructions themselves, and only then addressed High's attempted distinction of *Peek*. Although the court's view that High had presented no evidence of mitigating circumstances buttressed its conclusion that the jury instructions were adequate, it was not essential to that conclusion.[40]

High further contends that the Eleventh Circuit's decision in *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir.1991), requires that this issue be revisited. High asserts that relief was granted in that case "because the jury was instructed in a manner virtually identical to that in which Mr. High's jury was instructed." (Pet. at 161). Although High is correct that the *Cunningham* court distinguished his case on the grounds that no mitigating evidence had been presented, *Cunningham*, 928 F.2d at 1012, the *Cunningham* court also found, contrary to High's present assertion, that the charge in High's case was "significantly different" from the charge then at issue because High's jury was instructed that it could recommend a life sentence even if the State had proven one or more aggravating circumstances. *Id.* (citing *High v. Kemp*, 819 F.2d at 991).

High has not come forward with a reason that this claim, which already has been exhaustively considered by this Court and the Eleventh Circuit, should be addressed yet again. Furthermore, High does not show that a fundamental miscarriage of justice will result from failing to consider this claim, as the alleged inadequacy of the jury instructions does not tend to show that High was innocent of the crimes or that he was ineligible for the death penalty. Therefore, I will not consider this successive claim.

### H. Claim 11: The Application of Georgia's Aggravating Circumstances Statute

High alleges that the application of Georgia's aggravating circumstances statute to his case violates his Eighth and Fourteenth Amendment rights. High was sentenced to death because the jury found that

---

**40.** Furthermore, I note that this is the third time High has challenged the adequacy of the trial court's jury instructions on mitigating circumstances. In his motion for relief from judgment under Rule 60(b)(6), High challenged the correctness of the Eleventh Circuit's conclusion, making many of the same arguments that he makes in the instant Petition. I rejected the arguments High made in that motion, and the Eleventh Circuit found them "wholly without merit." *High v. Zant*, 916 F.2d at 1509 n. 2.

the murder and kidnapping of Bonnie Bulloch was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." O.C.G.A. § 17–10–30(b)(7).[41] High argues that the trial judge erroneously instructed the jury regarding this statute and that the Georgia Supreme Court failed to apply a limiting construction of the statute on appeal. However, High made this same allegation of error in his prior federal petition, and he shows no cause to justify reconsidering this claim.[42]

■ With respect to the miscarriage-of-justice exception, however, High contends that if this Court determines that his legal argument—that § 17–10–30(b)(7) was unconstitutionally applied in his case—is correct, then he cannot be eligible for the death penalty as a matter of law. Therefore, he argues, the Court must address this claim on the merits in order to determine whether he has shown that he is "innocent of the death penalty." In other words, High contends that the Court must evaluate the merits of this claim in order to determine whether he has shown that failure to do so will result in a fundamental miscarriage of justice.

■ This argument turns the miscarriage-of-justice inquiry on its head. This exception is concerned with actual as opposed to legal innocence; it presupposes the introduction of some new evidence tending to show that the petitioner is actually innocent of the crime or that he was actually ineligible for the death penalty. *See Johnson v. Singletary,* 938 F.2d 1166, 1181–83 (11th Cir. 1991). High presents no evidence showing that the kidnapping and murder of Bonnie Bulloch did not in fact involve "torture, depravity of mind, or an aggravated battery to the victim," but rather contends that the trial judge (and later the Georgia Supreme Court) applied an erroneous or overly broad construction of the statute.[43] In other words, High does not attempt to show facts which, had they been submitted to the jury, likely would have precluded a finding that he was eligible for the death penalty; instead, he simply reasserts his legal challenge to the way in which the statutory aggravating factors were explained to the jury and reviewed on appeal. High has not shown that a fundamental miscarriage of justice will result from failure to reconsider this claim, and I therefore decline to readdress it.[44]

41. I note that High erroneously asserts in his Petition that the Georgia Supreme Court set aside his death sentence on all grounds except the murder of Bonnie Bulloch. (Pet. at 168). This assertion is factually inaccurate and misleading. In reality, the court merely ordered High's sentence reduced to life imprisonment on the charges relating to the armed robbery and kidnapping of Henry Lee Phillips; the court upheld the death sentences for the murder *and kidnapping* of Bonnie Bulloch. *See High v. State,* 247 Ga. at 297, 276 S.E.2d 5. Moreover, the court emphasized that it was only reducing High's *sentence* with respect to those offenses and not disallowing any aggravating circumstances. *Id.*

I further note that High at times attacks the jury instructions on the grounds that the aggravating circumstances "torture, depravity of mind, or aggravated battery to the victim" were phrased in the disjunctive rather than the conjunctive. Although the Georgia Supreme Court employed the conjunctive "and" in its opinion, 247 Ga. at 296 [276 S.E.2d 5], the statute itself employs the disjunctive "or". O.C.G.A. § 17–10–30(b)(7); Ga.Code Ann. § 27–2534.1(b)(7); *see also Godfrey v. Georgia,* 446 U.S. 420, 422 [100 S.Ct. 1759, 64 L.Ed.2d 398] (1980) (quoting Ga. Code § 27–2534.1(b)(7) (1978)).

42. High does point to *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), in support of considering this claim again. That case, however, was simply an application of *Godfrey v. Georgia,* which High relied upon in his first petition. *See Cartwright,* 486 U.S. at 363, 108 S.Ct. 1853 ("[T]he Court of Appeals was quite right in holding that *Godfrey* controls this case."). Thus, the Supreme Court's decision in *Cartwright* provides no justification for reconsidering High's challenge to the application of Georgia's aggravating circumstances statute.

43. I note that High does submit evidence insofar as he attempts to discredit the testimony of Investigator Dykes that High confessed to taunting Bonnie Bulloch prior to his murder. This evidence, however, is considered in connection with High's claims relating to the newly discovered film. *See supra* Part III.A.2. As discussed therein, even assuming that the jury had been presented with the evidence that High now proffers, it does not support a clear and convincing finding that no reasonable juror would have found that High did in fact taunt the boy before he was killed.

44. Furthermore, the merits of this claim appear weak: contrary to High's assertions, on direct appeal the Georgia Supreme Court carefully reviewed the jury's findings as required by *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64

**1380**

### I. Claim 12: Jury Instructions on Conspiracy

■ High contends that he is entitled to habeas relief because the trial judge failed to instruct the jury that an overt act is an essential element of a conspiracy under Georgia law. *See* O.C.G.A. § 16–4–8. High did not bring this claim in his first federal petition, and he makes no attempt either to show cause for failing to do so or to show that a fundamental miscarriage of justice will result if the claim is not considered. Instead, High asserts that this claim is not barred as an abuse of the writ simply because Respondent did not specifically plead that defense to this particular claim.

■ In my view, High misapprehends Respondent's burden under *McCleskey*. The government is not required to plead abuse of the writ in response to every new claim brought in a second or successive petition; rather, the government need only detail the petitioner's prior writ history, identify those claims that were not raised previously, and aver that the new claims constitute an abuse of the writ:

> When a prisoner files a second or subsequent application, the government bears the burden of pleading abuse of the writ. The government satisfies this burden if, with clarity and particularity, it notes petitioner's prior writ history, identifies the claims that appear for the first time, and alleges that petitioner has abused the writ. The burden to disprove abuse then becomes petitioner's.

*McCleskey*, 499 U.S. at 494, 111 S.Ct. 1454. There is no question that High was on notice that Respondent intended to assert abuse of the writ as a defense to all previously unasserted claims. Indeed, because High's first federal petition was decided on the merits, every claim in the current Petition could be labeled either successive or abusive. Thus, this claim is barred as an abuse of the writ.

■ Furthermore, even assuming Respondent did not sufficiently plead abuse of the writ as a defense to this single claim, the claim fails on its merits. Accepting High's allegation that the trial judge committed legal error in failing to instruct the jury that an overt act is a necessary element of a

conspiracy, the error is harmless because there is no possibility that it affected the jury's verdict: High does not challenge the jury's apparent finding that High entered into an agreement with Ruffin and Brown to commit the kidnapping and murder of Bonnie Bulloch, and the jury also found that those crimes had been committed either by High and/or his co-conspirators. Thus, the jury necessarily found that overt acts—the crimes themselves—had been committed in furtherance of (indeed, in successful completion of) the conspiracy, even though they had not been instructed that such a finding was necessary.

Moreover, conspiracy was not the only basis upon which the jury could have found High guilty of the kidnapping and murder of Bonnie Bulloch. The jury also was instructed that High could be found guilty of the underlying crimes if they found that he aided or abetted in their commission or if he intentionally advised or encouraged others to commit the crimes. (Trial Tr. at 837). The evidence presented at trial amply supports a finding that High orchestrated and/or actively participated in Bonnie Bulloch's kidnapping and murder. Thus, the trial judge's putatively erroneous instructions on conspiracy did not affect the outcome of his trial.

### IV. EVIDENTIARY HEARING

■ High contends that he is entitled to an evidentiary hearing to establish the existence of either cause and prejudice or a fundamental miscarriage of justice. In order to be entitled to a hearing, however, High first must proffer specific facts that support such a finding. *Williams v. Turpin*, 87 F.3d 1204, 1208–09 (11th Cir.1996) High has failed to do so. Indeed, an evidentiary hearing is unnecessary because in examining High's claims, I have assumed the veracity of most of his factual assertions (though not his numerous legal conclusions). Even giving credence to High's allegations, they do not support a finding that High had cause for failing to raise and pursue his previously unasserted claims in his first petition, nor do they support a finding of cause sufficient to justify renewed consideration of the claims brought in that petition. In other words, the Record

L.Ed.2d 398 (1980). *See High v. State,* 247 Ga. at 296–98, 276 S.E.2d 5.

amply demonstrates that, even if High proves his allegations, he was not prevented from raising and pursuing these claims in his first federal petition.

■ Similarly, High's assertions do not support a finding that a fundamental miscarriage of justice will result if his claims are not considered on the merits. Although some of High's *allegations* about the content of the film conceivably could support such a finding, a review of the film *itself* reveals that many of these allegations are exaggerated and even false.[45] The creditable evidence proffered in High's Petition does not support a finding, under either a more-likely-than-not or a clear-and-convincing standard, that High was actually innocent of the kidnapping and murder of Bonnie Bulloch or that High was actually ineligible for the death penalty. Indeed, High's factual averments ignore much of the inculpatory evidence that was presented at his trial. Thus, High is not entitled to an evidentiary hearing.

## V. CONCLUSION

Although High raises numerous allegations of error in his current habeas corpus Petition, he is not entitled to have these claims considered on the merits. Furthermore, High is not entitled to an evidentiary hearing

to establish cause and prejudice or a fundamental miscarriage of justice, as his proffered evidence simply does not support such a finding. Indeed, the only miscarriage of justice revealed by this Record is that Jose High has managed to delay his execution for twenty years.

This Petition amounts to High's fifth collateral attack on his conviction and sentence; it is the third time he has applied to this Court for redress. Each time, this Court has expended much of its time and resources in a sifting examination of High's numerous claims; each time, it has been determined that High is not entitled to relief. The delays occasioned by High's legalistic litany to the state and federal courts demonstrate clearly the need for habeas corpus reform that is embodied in the AEDPA.

I have carefully considered whether High's claims are procedurally barred under the successive-claim and abuse-of-the-writ doctrines, and it is apparent that his he is not entitled to have them heard on the merits. Accordingly, High's Petition for a writ of habeas corpus is **DENIED**.

---

45. For example, it is asserted that on the film High "said he was innocent" and "specifically stated" that he "tried to stop the killing of Bonnie Bulloch." (Pet. at 15). The film reveals these assertions to be not only misleading, but plainly false. While High's counsel may have nobly undertaken an unpopular cause, I must emphasize that counsel's duty of candor to this tribunal is not qualified simply because his client is under a sentence of death.