Jose Martinez HIGH, Petitioner-Appellant,

v.

Frederick J. HEAD, Warden, Georgia Diagnostic and Classification Prison, Respondent-Appellee.

No. 98-9085.

United States Court of Appeals,

Eleventh Circuit.

April 19, 2000.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV196-67), Dudley H. Bowen, Jr., Judge.

Before ANDERSON, Chief Judge, and EDMONDSON and MARCUS, Circuit Judges.

ANDERSON, Chief Judge:

Jose Martinez High, convicted of murder, armed robbery, and kidnapping with bodily injury in the

state courts of Georgia and sentenced to death, appeals the district court's denial of his petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated below, we affirm.

## I. FACTUAL & PROCEDURAL BACKGROUND

The facts of this case were briefly summarized in a previous opinion of this Court as follows:

> Jose High and his accomplices, Nathan Brown and Judson Ruffin, robbed a service station. They abducted the operator of the station, Henry Lee Phillips, and his 11-year old stepson, Bonnie Bullock. Phillips was placed in the trunk of the car and Bullock in the back seat. High and his accomplices drove their captives to a remote site where they were to be eliminated. The 11-year old boy was taunted with threats of death as they rode in the back seat of the car. The child begged for his life. Upon reaching a deserted wooded area, the victims were forced to lie face down in front of the car and were then shot. Bonnie Bullock died of a bullet wound to the head. Phillips suffered a gunshot wound to the head and wrist, but miraculously survived and later identified High, Ruffin, and Brown. High later confessed to the murder.

*High v. Zant,* 916 F.2d 1507, 1508 (11th Cir.1990) (footnote omitted).[1]

---

[1]Our previous opinion referred to the deceased victim as Bonnie Bullock, rather than Bonnie Bulloch. In this opinion, we will adhere to the latter, as that is the spelling employed by both the petitioner's and the respondent's briefs to this Court in this appeal, as well that used in the trial transcripts and the district court's opinion.

Jose High was convicted in 1978 in the Superior Court of Taliaferro County, Georgia, of the following crimes: murder of Bonnie Bulloch, two counts of kidnapping with bodily injury, armed robbery, aggravated assault, and unlawful possession of a firearm during the commission of a crime. He was then sentenced to death. On direct appeal, the Supreme Court of Georgia reversed his convictions for aggravated assault and unlawful possession of a firearm during the commission of a crime because those crimes were held to have merged into the crimes of kidnapping with bodily injury and armed robbery. *See High v. State,* 247 Ga. 289, 276 S.E.2d 5 (1981). The court affirmed his remaining convictions and affirmed the sentence of death on the murder count and on the count of kidnapping Bonnie Bulloch, but vacated his death sentences for armed robbery and for the one count of kidnapping in which the victim did not die. *See id.* High's request for rehearing was denied, and the United States Supreme Court denied his petition for a writ of certiorari as well as his subsequent petition for rehearing. *See High v. Georgia,* 455 U.S. 927, 102 S.Ct. 1290, 71 L.Ed.2d 470, *reh'g denied,* 455 U.S. 1038, 102 S.Ct. 1742, 72 L.Ed.2d 156 (1982).

High next filed a state habeas corpus petition in the Superior Court of Butts County, Georgia, which was denied on September 10, 1982. The Supreme Court of Georgia affirmed and denied High's request for rehearing. *See High v. Zant,* 250 Ga. 693, 300 S.E.2d 654 (1983). The United States Supreme Court again denied his petition for a writ of certiorari and his petition for rehearing. *See High v. Kemp,* 467 U.S. 1220, 104 S.Ct. 2669, 81 L.Ed.2d 374, *reh'g denied,* 468 U.S. 1224, 105 S.Ct. 22, 82 L.Ed.2d 917 (1984). High then sought federal habeas corpus relief in the United States District Court for the Southern District of Georgia. The district court concluded that High's death sentence should be set aside due to the jury instructions given at the sentencing phase, while denying the writ with respect to High's other claims for relief. *See High v. Kemp,* 623 F.Supp. 316 (S.D.Ga.1985). On appeal, this Court reversed the district court's grant of relief and affirmed the denial of High's other claims. *See High v. Kemp,* 819 F.2d 988 (11th Cir.1987). This Court then denied High's request for rehearing en banc. *See High v. Kemp,* 828 F.2d 775 (11th Cir.1987). The United States Supreme Court initially granted High's petition for a writ of certiorari,

*see High v. Zant,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988), but later vacated that decision and denied certiorari. *See High v. Zant,* 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

High then filed a motion for relief from judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure in the United States District Court for the Southern District of Georgia, which was denied and that decision affirmed by this Court. *See High v. Zant,* 916 F.2d 1507 (11th Cir.1990). This Court also denied High's request for rehearing. The United States Supreme Court again denied High's petition for a writ of certiorari and his subsequent petition for rehearing. *See High v. Zant,* 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483, *reh'g denied,* 500 U.S. 938, 111 S.Ct. 2069, 114 L.Ed.2d 473 (1991).

High subsequently filed a second state habeas petition in the Superior Court of Butts County. That court held an evidentiary hearing in September of 1991 limited to the issues surrounding a filmed interview of High which had recently surfaced. The court dismissed High's entire petition in March of 1994, concluding that, to the extent High's claims were not already barred by res judicata principles, he reasonably could have raised them in his first habeas petition and therefore they were procedurally defaulted under O.C.G.A. § 9-14-51 (1993). The Supreme Court of Georgia denied High's application for a certificate of probable cause to appeal, and the United States Supreme Court once again denied High's petition for a writ of certiorari and his petition for rehearing. *See High v. Thomas,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671, *reh'g denied,* 516 U.S. 1154, 116 S.Ct. 1036, 134 L.Ed.2d 113 (1996).

On April 23, 1996, High filed a second federal habeas petition in the United States District Court for the Southern District of Georgia. On July 24, 1998, the district court denied his petition, finding that all of his claims were barred under either the successive claim or abuse of the writ doctrines. *See High v. Turpin,* 14 F.Supp.2d 1358 (S.D.Ga.1998). The district court judge granted a certificate of probable cause allowing this appeal on August 31, 1998.

On appeal, High asserts claims based on the previously missing film, as well as a claim based on his pretrial counsel's conflict of interest.[2] All of his claims raised on appeal were claims dismissed by the district court under the abuse of the writ doctrine.

## II. STANDARD OF REVIEW

When the government adequately pleads abuse of the writ in response to a petitioner's successive habeas petition,[3] the petitioner bears the burden of proving that his previously unasserted claims are not an abuse of the writ. *See McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). The petitioner's failure to raise a claim earlier will be excused if he can show "cause for failing to raise it and prejudice therefrom...." *Id.* If the petitioner cannot show cause, his failure to raise the claim in an earlier petition may nonetheless be excused if he can show that "a fundamental miscarriage of justice would result from a failure to entertain the claim." *Id.* at 494-495, 111 S.Ct. at 1470. Where abuse of the writ has been pleaded as a defense, a district court may not reach the merits of new claims unless a habeas petitioner shows either cause and prejudice or a fundamental miscarriage of justice. *See Sawyer v. Whitley,* 505 U.S. 333, 338-39, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992); *Macklin v. Singletary,* 24 F.3d 1307, 1309 (11th Cir.1994). We review district court decisions on abuse of the writ issues *de novo. See Macklin,* 24 F.3d at 1313.[4]

---

[2]The petitioner conceded at oral argument that he has abandoned the remainder of the claims he raised in the district court.

[3]Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts provides:

> A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

[4]High filed his petition one day prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and therefore the AEDPA standard of review provisions are not applicable. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding AEDPA standard of review provisions inapplicable in a noncapital case pending when AEDPA was enacted); *Mills v. Singletary,* 161 F.3d 1273, 1280 n. 6 (11th Cir.1998), *cert. denied,* --- U.S. ----, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000)

III. ANALYSIS

A.    *The Missing Film*

Two of petitioner's three claims hinge upon a filmed interview of High that took place on August 29, 1976, two days after his arrest for unrelated crimes in Richmond County, Georgia.  The interview was conducted inside the Richmond County jail and although the interview took place in 1976, the film was not produced until 1991.  High contends that the state suppressed the exculpatory content of the interview, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the law enforcement testimony at trial regarding the interview was at odds in material and exculpatory ways with what actually happened, in violation of *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

The filmed interview was conducted primarily by J.B. Dykes, an Investigator with the Richmond County Sheriff's Department, and William Anderson, then Sheriff of Richmond County.  High did not have access to the film of the interview prior to or during his trial, and the prosecution's witnesses testified that they did not know the film's whereabouts.  Former Sheriff Anderson testified at the 1991 state habeas hearing that, after having the film processed, he stored the developed cannisters of film in a footlocker in the trunk of his patrol car.  When he left office on December 31, 1976, he turned the car in and took the footlocker home.  Anderson claims that he forgot the film was in his footlocker until 1983 or 1984, at which time he was contacted by William Wilcher, a parole officer conducting a routine investigation into High's case.  Anderson gave the cannisters to Wilcher who in turn gave them to the Georgia Board of Pardons and Paroles.  The film remained in the Parole Board's files until a request was made by High's counsel under the Georgia Open

(holding same in a capital case).  In addition, the AEDPA's special habeas corpus procedures for capital cases, codified at 28 U.S.C. §§ 2261-66, do not apply because they require a state to "opt in" to them by meeting certain requirements, *see Neelley v. Nagle,* 138 F.3d 917, 921-22 (11th Cir.1998), *cert. denied,* 525 U.S. 1075, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999) (mem.), and the state here has not asserted that it opted in by meeting these requirements.

Records Act in 1991. At that point, the film was converted to VHS videocassette format and provided to High and his counsel.

Because High's claims that the state withheld and lied about a film containing exculpatory evidence were not raised in his first federal petition for habeas corpus relief, he must show either cause and prejudice or a fundamental miscarriage of justice in order to have these claims considered on the merits.

1.      *Cause*

In order to show cause for not raising a claim in an earlier petition, a petitioner must show "some external impediment preventing counsel from constructing or raising the claim." *See McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991) (emphasis and internal citation omitted). Examples of objective factors external to the defense that constitute cause include interference by officials and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). The Supreme Court emphasized in *McCleskey* that the abuse of the writ doctrine examines the *petitioner's* conduct and stated that "the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process...." *McCleskey,* 499 U.S. at 497, 111 S.Ct. at 1472. The fact that petitioner did not possess, or could not reasonably have obtained, certain evidence, however, fails to establish cause "if other known or discoverable evidence could have supported the claim in any event." *Id.* at 498, 111 S.Ct. at 1472. The Court further elaborated that the requirement of cause in the abuse of the writ context "is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." *Id; see also Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir.1995). A petitioner's opportunity to show cause and prejudice does not require an evidentiary hearing if the district court determines as a matter of law that the petitioner cannot satisfy the standard. *See McCleskey,* 499 U.S. at 494, 111 S.Ct. at 1470.

6

In examining whether High has demonstrated cause, it is helpful to distinguish, as the district court did, between a) his claims based upon what he did and did not say during the filmed interview, and b) his claim relating to his demeanor as revealed by the film. We discuss each category in turn.

(a)     *Claims Based Upon What High Said or Did Not Say—the Audiotape*

With respect to this category, the factual basis of those claims would have been fully revealed, in the absence of the missing film itself, by an audiotape of the interview. The trial transcript reveals the existence, at the time of trial, of such an audiotape.[5] While it is not entirely clear whether High's trial attorney

---

[5]The trial transcript reveals the following colloquy between High's trial attorney, John Ruffin, Jr., and GBI agent Ingram:

Q       (Ruffin): Now, Mr. Ingram, where is the tape?

A       (Ingram): Which tape, sir?

Q:      The tape that was made as a result of the TV simulation.

A:      The tape recording?

Q:      Well, where is the tape recording?

A:      In my pocket.

Q:      How long has it been in your pocket?

A:      Since yesterday.

Q:      Where did you get it?

A:      From Mr. Richard Allen, the District Attorney.

Q:      Mr. Richard Allen?

A:      Yes sir.

Q:      Now, where is the audio tape?

A:      I'm not familiar with that.

> Trial Transcript at 794. Undoubtedly, the latter part of this exchange reveals a confusion over nomenclature. Nevertheless, Agent Ingram clearly stated that he had a "tape recording" of the TV

7

specifically requested a copy of the audiotape after Agent Robert Ingram of the Georgia Bureau of Investigation ("GBI") testified that he had it in his pocket, High does not suggest that his first federal habeas counsel made any attempt whatsoever to obtain the audiotape.

High contends, nevertheless, that he had cause for not earlier raising his claims based upon the filmed interview because the factual basis of the claims was unavailable to him. He further argues that the reason the basis of these claims was unavailable was the State's misleading conduct; he asserts that what happened during the filmed interview was misrepresented under oath by the State's witnesses and argues that nothing in the state's inculpatory descriptions of the interview suggested a basis to investigate, much less plead, a *Brady* or *Giglio* violation. By this argument, High seeks to excuse his first federal habeas counsel's failure to attempt to obtain the audiotape of the interview.

We reject High's contention that he has shown cause for not raising these claims in his first federal petition. As noted, the trial transcript clearly reveals the existence of the audiotape of the interview. Moreover, High's first habeas counsel either had actual knowledge of facts, or should have discovered facts, that suggest the potential existence of *Brady* and *Giglio* claims—or at the very least, indicate a definite reason to investigate the possibility of such claims. High's trial attorney stated in his affidavit submitted in the second state habeas proceeding that, "Jose High always denied shooting the victims in this case, and always said that he had told the investigators that he did not shoot the victims." This statement is inconsistent with the law enforcement officers' testimony at trial as to what High said during the filmed interview and during the prior statements he made.[6] If High's first federal habeas counsel did not have actual knowledge of what

---

simulation in his pocket, that it had been there since the day before, and that he had gotten it from Mr. Richard Allen. This exchange leaves no real doubt of the existence, at the time of trial, of a tape recording of the filmed interview. During High's 1991 state habeas hearing, Ingram testified that it was in fact an audiotape of the interview that he had gotten from Richard Allen and that he had in his possession during the trial.

[6]Investigator Dykes testified that High told him that "he did the crime,"and also that High said, "they went to this place off of the dirt road and that they all started shooting." GBI agent "Chuck" Monahan testified that High said on the film that "he had come through Crawfordville, Georgia on the night in question with the

High said to defense counsel John Ruffin, he certainly could reasonably have discovered this information from Ruffin.[7] Thus, we find High's argument that his first habeas counsel had no reason to investigate much less plead a *Brady* or *Giglio* violation unpersuasive and insufficient to excuse his counsel's failure to seek to obtain the audiotape at the time of his first federal habeas petition.[8] Had counsel sought and obtained the audiotape, he would have had all the facts needed to support High's current claims based on what he did and did not say during the filmed interview.

High also seeks to rely on the prosecution's general representation, before trial, that it had complied with its obligation under *Brady,* arguing that that representation, combined with the inculpatory prosecution

---

parties in question and committed the murder of Bonnie Bulloch." Agent Ingram testified that High told him "that the man and the boy were laid down in front of the vehicle, in the headlights, and—as he described it—they unloaded on him." Ingram later testified that during the filmed interview High "made a very brief reference to Crawfordville stating that he had committed the crime and that it was over and done and to drop it." On cross-examination, in response to the question of whether High had told him that he didn't shoot the two victims, Ingram stated that High did not say he fired a gun, but that he didn't tell him he did not shoot them, either.

[7]There is no indication in the record that High's current habeas counsel had any trouble learning this information from Ruffin.

[8]High asserts that his first habeas counsel would not have gotten the various depictions of the filmed interrogation from the State if he had asked for them. We decline to make that assumption, however, when absolutely no attempt was made by habeas counsel to obtain them. The fact that the State had not provided High's trial counsel with the audiotape does not dictate that the State would not have given the audiotape to his first habeas counsel if he had made a specific request for that item. The State's duty to disclose exculpatory material is ongoing. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987); *see also Thompson v. Calderon,* 151 F.3d 918, 935 n. 12 (9th Cir.) (Reinhardt, J., concurring and dissenting), *cert. denied,* 524 U.S. 965, 119 S.Ct. 3, 141 L.Ed.2d 765 (1998) ("The *Brady* duty is an ongoing one, and continued to bind the prosecution throughout Thompson's habeas proceedings.") While the State may have made an initial determination that the audiotape of the interview was not exculpatory, nothing prevented High's first habeas counsel from specifically requesting that item and arguing that he had reason to believe that it might in fact be exculpatory. *Cf. Ritchie,* 480 U.S. at 60, 107 S.Ct. at 1003 (noting that if a defendant is aware of specific information in the State's files, he is free to request it directly from the court, and argue in favor of its materiality). More importantly, High's habeas counsel had at his disposal in his federal habeas proceeding discovery tools pursuant to federal law. *See* Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts. We recognize that a petitioner's entitlement to discovery in federal habeas is within the district judge's discretion and only allowed for good cause shown; nevertheless, we think that readily obtainable facts would have supported a request for discovery under Rule 6.

description of the tape, invited defense reliance. High further asserts that *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) stands for the proposition that a defendant can rely upon the State's representation that it has revealed and produced all exculpatory evidence. We conclude, however, that *Strickler* does not control this case. The Supreme Court did find on the particular facts of *Strickler* that it was reasonable for the petitioner's trial counsel, as well as his collateral counsel, to rely on the presumption that the prosecutor would fully perform his duty under *Brady* and on the implicit representation that all such materials would be included in the open files tendered to the defense. *See* 119 S.Ct. at 1949-52. We do not read *Strickler,* however, to indicate that defense reliance on a general government representation of compliance with *Brady* establishes cause for failing to pursue available exculpatory evidence where collateral counsel had actual knowledge or reasonably could have discovered knowledge clearly suggesting that the prosecution may have misinterpreted that evidence as nonexculpatory. As noted, High's first habeas counsel either knew or could reasonably have discovered that High's statements to his trial attorney concerning what he told the investigators were inconsistent with what the investigators said he told them during the filmed interview. Moreover, expressly disclaiming a holding that would control this case, the Court in *Strickler* stated:

> We do not reach, because it is not raised in this case, the impact of a showing by the State that the defendant was aware of the existence of the documents in question and knew, *or could reasonably discover,* how to obtain them.

119 S.Ct. at 1951 n. 33 (emphasis added).

We also reject High's contention that *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988) controls this case. In *Amadeo,* the petitioner first raised a constitutional challenge to the composition of his juries on direct appeal to the Georgia Supreme Court, based upon a newly discovered memorandum from the District Attorney Office's of Putnam County evidencing a scheme to intentionally underrepresent black people and women on the master jury lists from which all grand and traverse juries were drawn. *See id.* at 217-218, 108 S.Ct. at 1774. The state courts refused to hear the claim because it had not

10

been raised earlier, but the federal district court judge found that petitioner had established sufficient cause and prejudice to excuse the procedural default. *See id.* at 219-220, 108 S.Ct. at 1775. A divided panel of this Court reversed, but the Supreme Court reversed this Court's decision, finding that sufficient evidence in the record supported the district court's factual findings and that this Court should not have set them aside. *See id.* at 229, 108 S.Ct. at 1780. Unlike this case, however, there is no indication in *Amadeo* that the petitioner's attorneys had any idea that the D.A.'s memorandum, direct evidence of discrimination, even existed until it was discovered by "mere fortuity"[9] by an attorney working on a different case. *Id.* at 224, 108 S.Ct. at 1778. High's first habeas counsel knew, or should have known from the face of the record, that an audiotape of the filmed interview existed and was in the State's possession, yet he made no effort to obtain it at the time High filed his first federal habeas petition.

By making absolutely no effort to obtain an item of evidence the existence of which he was aware and which reasonably discoverable evidence suggested might in fact be exculpatory, High did not conduct the "reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition" that *McCleskey* requires. 499 U.S. at 498, 111 S.Ct. at 1472. Having made no attempt to obtain the audiotape which Agent Ingram testified at trial was in his pocket, High has not shown "some external impediment preventing [him] from constructing" his claims based on what he did and did not say during the filmed interview. *Carrier,* 477 U.S. at 488, 106 S.Ct. at 2645. Thus, with respect to those claims, we conclude that "by reasonable means [High] could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process...." *McCleskey,* 499 U.S. at 498, 111 S.Ct. at 1472.

(b)     *Claim Relating to High's Demeanor as Revealed on the Film*

---

[9]The petitioner argues that the film was unavailable until it, like the memorandum in *Amadeo,* was discovered by "mere fortuity." Again, we emphasize that we find defendant's argument with respect to the alleged unavailability of the film unpersuasive because the evidence supporting petitioner's claims would have been revealed by the audiotape.

11

We also conclude that High has not shown cause for not raising in his first federal habeas petition his claim relating to his demeanor as revealed by the film. High asserts a *Brady* claim, arguing that the State suppressed material, exculpatory evidence in the form of a film that reveals the petitioner as having been mentally ill at or around the time of the offense and his confessions. In support of his argument that his demeanor on the film is evidence of mental illness High offers the opinions of Dr. Bob Rollins, Dr. David R. Price, and Dr. Alec J. Whyte. A careful review of their affidavits, however, reveals that all three experts rely significantly, although admittedly not exclusively, on the actual, specific *substance* of what High said during the filmed interview, particularly on his statements that indicate grandiose and delusion.[10] Because

---

[10]Dr. Rollins states in his affidavit:

> [P]arts of the tape also show that Jose High was not in complete touch with reality. He says that he believes he can control persons by not letting them look into his eyes, and that he received this power from an outside force. He says that he will be able to control people who will be unable to see him when he gets out of prison....

Affidavit of Bob Rollins, M.D., June 10th, 1991, p. 6.

Dr. Price states in his affidavit that "delusions of grandeur and paranoia were rampant" in the filmed interview, noting in particular that:

> [High] states that he was head of a gang that stretched across many states and had thirty followers. He also stated that he communicated with his "mind" and "used psychology." He said he could control persons because he was empowered by an external force about which he could not speak. Nothwithstanding his status as the head of a crime family, he had to be home by 10:30 every night.

Affidavit of David R. Price, Ph.D., June 9th, 1991, p. 8.

Dr. Price further opines:

> [The film] also reveals evidence of mental illness, specifically schizophrenia. Jose High did not have the capacity to run a crime family, and certainly was incapable of controlling anyone through "brain power".... Jose High is grandiose on the tape. He irrationally states that he will get out of prison and control a crime family whose members will be unable to see him. He states that he runs a major crime family yet must be home early every night so that his parents will not be unhappy. He states that he meditates, that he is empowered by an external force, and that he makes people do what he wants through "brain power"....

Price Affidavit, pp. 13-14.

12

the audiotape would have revealed these statements, we conclude that the petitioner has not shown cause for not raising this claim in his first federal petition, for the same reasons we concluded above that he had not shown cause with respect to his claims relating to what he said on the film. While it may be true that only the actual film itself could have fully revealed the petitioner's demeanor during the interview, we conclude that the audiotape would have revealed enough of what petitioner's experts now contend is evidence of mental illness that the petitioner has not shown cause. The fact that the film itself might have provided *stronger* evidence of mental illness than the audiotape is not enough to constitute cause in the abuse of the writ context. *See McCleskey,* 499 U.S. at 498, 111 S.Ct. at 1472 ("Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim.")[11]

2.      *Prejudice*

---

Dr. Whyte comments that the film "reveals signs and symptoms of a major mental disorder." Dr. Whyte specifically notes certain "behavioral diagnostic symptoms" that High manifested on the film:

—preoccupation with one or more systematized delusions. Jose, throughout the interview and during a more extended period of his life was demonstrating his false belief that he was the respected and feared head of an organized mafia-type crime family whose members he controlled by his mind power and that of some outside unnamed force. This delusion revealed both the grandiose and paranoid features characteristic of the paranoid type of schizophrenia. Strongly suggested were delusions of greater grandiosity, e.g., that we [sic] would lead a takeover by Black people, and that he would go away but return and invisibly control his followers.

—flat or grossly inappropriate effect. Jose's emotional responsiveness to the highly emotional content of the interview was pervasively and characteristically flat and inappropriate. A part of this may have been a reflection of the delusional self that he was portraying.

Affidavit of Alec J. Whyte, M.D., June 11th, 1991, pp. 3-5.

[11]To the extent that the general observations of Doctors Rollins, Price and Whyte with respect to High's present and past mental state are based on their examinations of High and/or his personal and social history, we note that such evaluations have always been available to counsel, and thus High cannot show cause for the failure of his first federal habeas counsel in this regard.

13

Even if High were able to show cause for not raising his claims related to the film in his first federal habeas petition, he would still have to show prejudice in order to have those claims considered on the merits. That he cannot do.

To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982). He must "convince us that 'there is a reasonable probability' that the result of the trial would have been different if the [allegedly suppressed and misrepresented filmed interview] had been disclosed to the defense." *Strickler,* 119 S.Ct. at 1952 (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995)). In other words, "the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler,* 119 S.Ct. at 1952 (internal citation omitted).[12] High asserts that the film reveals: a) him saying that he did not kill anyone, thus professing his innocence, b) his inability to stop Ruffin and Brown from killing Bulloch, c) that High does not say anything about taunting Bulloch or about Bulloch begging, and d) High speaking, acting, and appearing crazy.

Contrary to the suggestion in High's brief, the filmed interview does not reveal High affirmatively protesting that he is innocent of this crime. High relies solely on a police officer's question that includes the phrase "you say you didn't kill anyone,"[13] as evidence of his innocence. Later in the film, however, High is

---

[12]The *Strickler* majority treats the prejudice inquiry as synonymous with the materiality determination under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in keeping with "suggestions in a number of [Supreme Court] opinions...." *Strickler,* 119 S.Ct. at 1956 n. 2 (Souter, J., dissenting).

[13]That phrase appears in the following exchange:

> Question:     Alright, in each of these crimes, or each of these incidents as you want to call em, you used a shotgun, or you had your [family] members use a shotgun, can you explain that?

> High:     Well, with a pistol or handgun somebody think twice but somebody got a big rod

14

asked to briefly outline the crime in Crawfordville, which is the crime here at issue; rather than denying his culpability, his answer was a noncommittal "No comments." Moreover, it is apparent from the film that the murder was done for High, and that he was instigator and leader.[14]

Neither does the film reveal High asserting that he attempted to prevent Ruffin and Brown from killing Bulloch, as the petitioner's brief also suggests. High relies on the following passage as evidence that he could not stop his companions from taking Bulloch's life:[15]

Question: Did you have any feelings about the young boy? Did he look in your eye?

High: No, he didn't.

---

in your face, you ain't gonna do but what they tell you to do.

Question: Did you ever at any time, you say you didn't kill anyone, did you ever at any time think that one of your family was not going to obey one of your orders?

High: Yes.

Question: Can you name any incidents?

High: In Richmond County today.

Question: Today? How did that happen?

High: They snitched.

1991 State Habeas Transcript at 737.

[14]High also complains that officers stated at trial that High said on the film that he committed the murder of Bulloch, and asserts that he in fact did not. We readily conclude, however, that High was not prejudiced by this apparent inconsistency, when, even if High did not state on the film, in so many words, that he had killed Bulloch, the film does in fact clearly suggest that High was the leader of the three perpetrators and that the murder was committed for him.

[15]There are several inconsistencies, most of them slight, between the version of this excerpt contained in the unofficial transcript of the film that the petitioner attached to his brief to this Court and the district court's rendition, which was made from its own review of the film. *See High,* 14 F.Supp.2d at 1372 n. 25. Because our independent review of the film reveals that the district court's version is not clearly erroneous, we adopt it. *See Freund v. Butterworth,* 165 F.3d 839, 861 (11th Cir.), *cert. denied,* --- U.S. ----, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999).

15

Question: Did you have any feelings about him?

High: Yes. He was too young. But what's done is done.

Question: You didn't have control enough to stop them from taking his life?

High: Not then.

Question: In other words, when this happened, it was sort of ... You were gaining ...

High: This was one of the first that they did for me.

Question: And you could control them to the point where they would do what you told them ...

High: Well, I knew that ...

Question: ... but you didn't have one-hundred percent total control over them. Is that right?

High: No, I wasn't positive about the first two.

Question: At that point.

High: So, I figure if they will kill one person I know that I have enough to get them in a whole lot of trouble.

*High,* 14 F.Supp.2d at 1372. Considered as a whole, we think it likely that a jury would find this passage to be much more inculpatory than exculpatory—the passage suggests that High played an active role in this crime, it suggests that he was the leader of the group, although he may not have had total control over the other two men, and it indicates that the murder was committed *for* him. Thus, we cannot conclude that, had the jury had the benefit of this exchange at trial, there would have been a reasonable probability of a different outcome.

Neither was High prejudiced by his inability to reveal to the jury the film's *absence* of any discussion of High taunting Bulloch or Bulloch begging for his life. Investigator Dykes testified at trial that High told him, in a statement independent of the film, that he taunted Bulloch as they drove out to a remote location. The fact that High did not repeat that statement in the film does not significantly undermine Dykes's testimony that High told him he had done so in a separate statement. Dykes also testified that High said, in

16

his independent statement to Dykes, that Bulloch begged for his life. While Dykes did testify, outside of the jury's presence, that High repeated that statement during the filmed interview, when in fact he did not, High was not prejudiced by Dykes's incorrect statement about the content of the film, as the jury did not hear it. The petitioner suggests that Dykes's testimony about Bulloch begging for his life played a significant role in the jury's decision to impose the death penalty and also seems to suggest that the fact that Dykes incorrectly indicated that High repeated that statement in the filmed interview suggests that High never said anything, at any time, about Bulloch begging for his life (or even about High taunting Bulloch). Even if the jury had known that Dykes stated that High had said Bulloch begged for his life in the film, and had known that High in fact did not, however, the petitioner has not convinced us that a reasonable juror might not still believe that High had made that statement to Dykes in his earlier confession. Thus, this argument falls short of putting the whole case in such a different light such that our confidence in the outcome is undermined.

High also argues that he is, and was at the time of the crime, mentally ill and that his mental illness is readily apparent from a viewing of the film; as noted, he has introduced expert testimony to that effect. High, however, cannot show prejudice from his inability to demonstrate his asserted mental illness to the jury via the film. No other evidence of mental illness was adduced at trial. From our own viewing of the film, we are unpersuaded that it, as the single piece of mental health evidence that would have been adduced, is such a compelling indication of mental illness so at to convince us that there is a reasonable probability that the result of the trial would have been different if the jury had been able to view the film. To the extent, if at all, that the petitioner argues that he was prejudiced because possession of the film would have allowed him to present additional mental health expert testimony at trial, we disagree. There is no indication that High himself was not available for evaluation prior to and during the trial, and the absence of the film in no way prevented his trial counsel from having additional professional evaluations of him performed and introducing such evaluations at trial. Indeed, High was examined once under court order during the relevant time frame, with respect to the unrelated charges that he faced in Augusta.

17

The evidence introduced at trial against the petitioner was overwhelming; it included an eyewitness identification from Phillips, the surviving victim, and the testimony of three different law enforcement officers about statements the petitioner made about his involvement in the crime.[16] In light of this evidence, the petitioner's current complaints relating to the film, even when considered collectively, are not significant. Had the petitioner been able to make use of his filmed interview during his trial, we conclude that it would have had, at most, a negligible impact on the outcome.[17] Thus, the petitioner has not demonstrated that there is a reasonable probability that the result of his trial would have been different if the filmed interview had been disclosed to the defense.

3.      *Miscarriage of Justice*

Because the petitioner has not demonstrated cause and prejudice sufficient to excuse his failure to present these claims in his first federal petition, he "may obtain review of his constitutional claims only if he falls within the 'narrow class of cases ... implicating a fundamental miscarriage of justice.' " *Schlup v. Delo,* 513 U.S. 298, 315, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995) (quoting *McCleskey*, 499 U.S. at 494, 111 S.Ct. at 1470). The miscarriage of justice exception "is concerned with actual as compared to legal innocence." *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). "To be credible," a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. at 865.

The miscarriage of justice standard that a petitioner must meet differs depending on the challenge brought by the petitioner. If the petitioner claims actual innocence of the underlying crime, he must show that " 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' "

---

[16]Investigator Dykes testified that High made a statement to him, Agent Ingram testified that High made a statement to him, and Agent Monahan testified that he was present when High made his statement to Ingram.

[17]We think it quite possible that introduction of the filmed interview would have actually had a negative impact on the petitioner's case at trial, considering the film's suggestion, among other things, that High was the leader of the three perpetrators and that the murder of Bulloch was committed for him.

*Id.* at 327, 115 S.Ct. at 867 (quoting *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649-2650). More specifically, the petitioner must demonstrate "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327, 115 S.Ct. at 867. If, however, a capital petitioner "challenges his death sentence in particular, he must show 'by clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty in light of the new evidence." *Calderon v. Thompson,* 523 U.S. 538, 559-60, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998) (quoting *Sawyer,* 505 U.S. at 348, 112 S.Ct. at 2523).

High asserts both his actual innocence of the underlying crime and his actual innocence of the death penalty. Specifically, he asserts that the following is new evidence showing that he is actually innocent of the murder of Bulloch: 1) evidence that he did not kill Bulloch, in the form of: a) a statement, allegedly withheld from his trial counsel, that he made to Agent Monahan after he was arrested that he was present when Bulloch was killed, but that he did not kill anyone, and b) the film, revealing that he told the police that he did not kill anyone and that he did not have enough control over his two companions to stop them from killing Bulloch; 2) evidence that the law enforcement investigation and testimony were suspect, in the form of: a) an affidavit from a handwriting expert opining that the petitioner did not write a list of questions introduced at trial as questions he wanted to be asked during the filmed interview, b) the fact that he did not say during the filmed interview that he taunted Bulloch and that Bulloch begged for his life, and the fact that Investigator Dykes testified to the contrary revealed that his investigation and testimony were suspect; and c) the fact that the prosecutor's closing argument, describing the filmed interview, was allegedly inaccurate; and 3) evidence that he is and was severely mentally ill.

Despite this list of asserted new evidence, High has not established that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. High's new evidence in the form of his statements that he did not kill anyone—both the statement to Agent Monahan and that on the

19

film—is not the persuasive showing of actual, factual, innocence that the petitioner claims it to be.[18]  Even if High himself did not actually shoot Bulloch,[19] the evidence is overwhelming that he would nevertheless still be guilty of the charged offense of murder.  Evidence was presented at trial, in the form of statements (independent of the filmed interview) that High gave to Investigator Dykes and to Agent Ingram revealing that High, Ruffin and Brown worked together to rob, abduct, and shoot Phillips and Bulloch.  In addition, Phillips physically identified High as one of the perpetrators.  From this substantial evidence, the jury could reasonably have found a plan or conspiracy to rob and kill the victims,[20] and thus, High, even if he was not the trigger man, would still be guilty of the murder of Bulloch.  *See Thomas v. State,* 255 Ga. 38, 334 S.E.2d 675, 676-77 (1985);  *see also Cargill v. State,* 256 Ga. 252, 347 S.E.2d 559, 560 (1986) (" '[i]t matters not whether it was appellant or [his accomplice] who actually fired the gun during the robbery which resulted in [the victim's] death.  The act of one was the act of the other in the commission of the armed robbery and the ensuing death which resulted therefrom.' ") (quoting *Strong v. State,* 232 Ga. 294, 206 S.E.2d 461, 464 (1974)).[21]

Neither do the petitioner's arguments that the law enforcement investigation and testimony were suspect persuade us that High is actually innocent of the murder.  High argues that an affidavit from a

[18]As discussed above, from the film, High relies solely on a police officer's question that includes the phrase "you say you didn't kill anyone," as evidence of his innocence.  Moreover, the petitioner's statement to Agent Monahan is not a more persuasive denial of guilt or protestation of innocence.  Monahan's report of High's statement simply states, "High, after being advised of his rights, asked if he could be found guilty of murder simply because he was present when the boy (Bonnie Bulloch) was murdered, to which Agent Monahan replied that he could.  High stated that he was present bud (sic) he did not kill anyone."  Instead of a denial of guilt, High's statement might be interpreted as an attempt on his part to avoid responsibility for the killing.

[19]Indeed, we cannot assume that High did not actually shoot Bulloch.  The film and Monahan's report of High's statement to him are both equivocal in this regard, whereas both Investigator Dykes and Agent Ingram unequivocally testified that High stated that they all engaged in the shooting.

[20]The jury did in fact receive a charge on Georgia law regarding conspiracy.

[21]In addition, as previously discussed, we find unpersuasive the petitioner's suggestion that the film reveals that he attempted to prevent his companions from killing Bulloch.

20

handwriting expert proves that High did not write the list of questions introduced at trial as questions he wanted to be asked during the filmed interview. This affidavit, if available at trial, could have been used to impeach the officers' testimony that High did write those questions.[22] High also points again to the fact that he did not say on the film that he taunted Bulloch and that Bulloch begged for his life and to the fact that Dykes testified to the contrary outside of the jury's presence. As we previously stated, we do not think the fact that High did not say on the film that he taunted Bulloch significantly undermines Dykes's testimony that High told him he had done so in a separate statement. If Dykes's erroneous testimony that High said on the film that Bulloch begged for his life had been given in front of the jury, then the film, if then available, could have been used to impeach Dykes. We conclude, however, that in light of the substantial evidence that was produced at trial, including three different officers' testimony about High's confessions and the positive identification from Phillips, none of this "impeachment evidence provides [a] basis for finding a miscarriage of justice." *Thompson,* 523 U.S. at 563, 118 S.Ct. at 1504 ("As in *Sawyer,* the evidence is a step removed from evidence pertaining to the crime itself.... It tends only to impeach the credibility of Fink and Del Frate. To find that these matters in all probability would have altered the outcome of Thompson's trial, we should have to assume, first, that there was little evidence of rape apart from the informant's testimony....") Similarly, we conclude that the alleged inaccuracies in the prosecutor's closing argument do not undermine the integrity of the investigation or prosecution of this case, and certainly do not persuade us that High is actually innocent.

Nor does petitioner's argument that he is, and was at the time of the crime, mentally ill persuade us differently. Assuming *arguendo* that High has brain damage, borderline intellectual functioning, and is

---

[22]We note, however, that High's trial attorney in fact argued to the jury in his closing statement that High did not write those questions and he asked the jury to compare the writing of the questions with High's signature on the indictment. Thus, we can presume that, to the extent the jury thought that the question of whether or not High wrote those questions was ultimately significant, it made its own determination. *See United States v. Cashio,* 420 F.2d 1132, 1135 (5th Cir.1970) (jury is entitled to make a comparison of handwriting known to be genuine with handwriting in question to determine whether handwriting in question is genuine). The only thing actually "new" about this evidence is the affidavit of the handwriting expert.

seriously mentally ill, we are unpersuaded that High has demonstrated that he was so mentally ill at the time of the murder of Bulloch that he did not have the capacity to formulate the necessary intent to commit the crime. Thus, we cannot conclude from the petitioner's evidence of mental illness that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. In sum, considering all of High's "new evidence" in light of the totality of the evidence in the record, we cannot conclude that it is more likely than not that no reasonable juror would have found petitioner guilty.

We turn next to High's challenge to the death penalty, and his argument that with his "new evidence" he has made the necessary miscarriage of justice showing. We conclude that petitioner has not demonstrated by clear and convincing evidence that "no reasonable juror would have found him eligible for the death penalty in light of the new evidence." *Thompson,* 523 U.S. at 560, 118 S.Ct. at 1503. In imposing the death penalty on the petitioner, the jury found the following aggravating circumstances: "[t]he offense of murder and armed robbery and kidnapping was outrageously or wantonly vile, horrible, inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim." *See* O.C.G.A.. § 17-10-30(b)(7). The Georgia Supreme Court, on direct appeal, found that the evidence of serious psychological abuse by the petitioner to Bulloch before Bulloch's death, especially in view of the victim's young age and physical characteristics, supported the jury's finding of aggravating circumstances beyond a reasonable doubt. *See High v. State,* 247 Ga. 289, 276 S.E.2d 5, 13 (1981). The Georgia Supreme Court further found that the crime was outrageously or wantonly vile, horrible or inhuman because the victim was a young child who was not a member of the petitioner's family and who had in no way provoked the petitioner to assault him. *See id.*

As explained above, the petitioner's "new evidence" does not significantly undermine the evidence of his liability for the murder of Bulloch. We also conclude that petitioner's "new evidence" does not significantly undermine the evidence that the Georgia Supreme Court found supported the jury's finding of aggravating circumstances which made the petitioner eligible for the death penalty. As explained above, High's "new evidence" does not significantly undermine the evidence of petitioner's psychological abuse of

22

Bulloch just prior to the murder. We have also carefully considered whether the "new evidence" of High's mental heath undermines the aggravating circumstances that render High eligible for the death penalty. We have carefully reviewed all of the mental health evidence adduced by petitioner in the 1991 evidentiary hearing in state habeas court, including the filmed interview itself, and the doctors' reports interpreting the film and their opinions with respect to High's mental health generally.[23] Although petitioner has adduced considerable evidence that High was suffering from a major mental illness at the time he was evaluated by the doctors in 1991 and for 10 years previous thereto, and has also adduced some evidence that High was suffering from mental deficiencies or abnormalities at and around the time of the offense and his arrest, we cannot conclude that High has demonstrated by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of this "new evidence." We of course evaluate this "new evidence" in light of the totality of the evidence previously adduced.[24] *See Schlup v. Delo,* 513 U.S. at 328, 115 S.Ct. at 867. We conclude that High has failed to satisfy the very high threshold showing required under the case law to demonstrate a miscarriage of justice with respect to the penalty phase. Accordingly, High has not shown that a fundamental miscarriage of justice will result if his claims based upon the missing film are not heard on the merits, and those claims are thus barred as an abuse of the writ.

B.    *Conflict of Interest*

---

[23]In light of our disposition, we need not in this case resolve the dispute between the parties with respect to the evidence upon which a petitioner can rely in attempting to establish a miscarriage of justice. The state asserts that a petitioner can rely only upon evidence directly related to the underlying constitutional violation which petitioner is seeking to have the court address on the merits. Thus, in the instant case, the state asserts that High can rely only upon the filmed interview itself, which allegedly was suppressed in violation of the Constitution. Under the state's theory, High could not rely upon the general evidence of mental illness, unrelated to the allegedly suppressed film. On the other hand, High argues that he should be able to rely upon any and all evidence in his effort to establish a miscarriage of justice, whether or not the evidence is related to the alleged constitutional violation which he is urging us to address on the merits. For the reasons indicated in the text, we need not resolve this dispute between the parties.

[24]For example, the only mental health examination which was conducted at the relevant time apparently suggested no major mental illness.

The petitioner also argues that he was deprived of his Sixth, Eighth, and Fourteenth Amendment rights by his pretrial counsel's simultaneous representation of the petitioner and his two accomplices. Before his trial, the petitioner was represented by Walton Hardin. Hardin was appointed by the Superior Court of Taliaferro County to represent the petitioner, as well as Ruffin and Brown, in March of 1977. In February of 1978, High retained John H. Ruffin, Jr. (who is not related to the petitioner's accomplice, Judson Ruffin), while Ruffin and Brown continued to be represented by Hardin.[25] Ruffin and Brown were each eventually granted federal habeas relief because of Hardin's conflicted representation. *See Ruffin v. Kemp,* 767 F.2d 748 (11th Cir.1985); *Brown v. Kemp,* No. CV 188-027 (S.D.Ga.1989). The petitioner now argues that he is entitled to the same relief. Because the petitioner did not raise this claim in his first federal habeas petition, however, it is also subject to the abuse of the writ analysis.

The petitioner cannot show cause for not raising this claim in his first federal petition. He suggests that his first habeas counsel's inexperience with capital habeas corpus petitions constitutes cause. This argument fails, however, because "counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation." *Coleman v. Thompson,* 501 U.S. 722, 754-55, 111 S.Ct. 2546, 2567, 115 L.Ed.2d 640 (1991) ("In the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation."). Defendants have no constitutional right to counsel when collaterally attacking their convictions; this is true even in capital cases. *See Hill v. Jones,* 81 F.3d 1015, 1024 (11th Cir.1996); *see also Callins v. Johnson,* 89 F.3d 210, 212 (5th Cir.1996) (concluding that "no error by habeas counsel can ever constitute cause for abusing the writ"). Because the petitioner "by reasonable means could have obtained ... a sufficient basis to allege [this] claim in [his] first petition and pursue the matter through the habeas process," he has failed to demonstrate cause. *McCleskey,* 499 U.S. at 498, 111 S.Ct. at 1472.

---

[25]High's trial began in November of 1978.

Nor has the petitioner shown that a fundamental miscarriage of justice will occur if this claim is not heard on the merits. High asserts, with no supporting citation of authority, that if a petitioner can show a conflict of interest, then he has necessarily shown enough innocence to have the conflict claim addressed on the merits. In other words, the petitioner apparently argues that if he can show a conflict of interest, he need not show actual, factual innocence. However, this argument is inconsistent with the plain meaning of Supreme Court precedent describing the showing that is required to come within the miscarriage of justice exception to the abuse of the writ doctrine. *See, e.g., Schlup,* 513 U.S. at 316, 115 S.Ct. at 861 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."). It is also inconsistent with precedent of our own Court. *See, e.g., Porter v. Singletary,* 49 F.3d 1483, 1485 (11th Cir.1995) (*per curiam* ) (concluding that petitioner's claim that the attorney who represented him at sentencing was ineffective because he labored under a conflict of interest was barred as an abuse of the writ because the petitioner had not demonstrated cause and prejudice or a miscarriage of justice); *Weeks v. Jones,* 26 F.3d 1030, 1046 (11th Cir.1994) (concluding that petitioner's claim that trial counsel was ineffective because of a conflict of interest was procedurally barred); *cf. Brownlow v. Groose,* 66 F.3d 997, 999 (8th Cir.1995) (concluding that the petitioner had failed to make the necessary showing of actual innocence required by *Schlup* to overcome the procedural default barrier to his claim that his attorney was ineffective due to a conflict of interest).

As discussed above, the showing that is required to come within the miscarriage of justice exception is a demonstration "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327, 115 S.Ct. at 867. And for a challenge to a death sentence in particular, a petitioner "must show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of the new evidence." *Thompson,* 523 U.S. at 560, 118 S.Ct. at 1503, (internal citation omitted). The petitioner has made neither showing. He seeks to rely

25

again on the "new evidence" asserted above to support his contention that his claims relating to the missing film must be heard to avoid a miscarriage of justice. As already discussed, however, that new evidence falls short of the showing required by the miscarriage of justice exception to the abuse of the writ doctrine. The totality of the evidence in the record, including the asserted new evidence, supports the conclusion that the petitioner planned or conspired to rob, kidnap, and murder Phillips and Bulloch, that he participated in putting Phillips in the trunk of the car and the boy in the back seat, that High taunted or psychologically abused the boy, that they traveled to a remote location to carry out the murder and attempted murder, and that High was the leader of the three coconspirators in this venture even if he himself was not the trigger man. We readily conclude that the petitioner has failed to show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt and has failed to show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty.

For the foregoing reasons, the judgment of the district court denying relief is

AFFIRMED.